1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10   PAO LO,

11              Petitioner,              2: 05 - cv - 1754 - MCE TJB

12        vs.

13   A.P. KANE,

14              Respondent.          FINDINGS AND RECOMMENDATIONS

15   _____/

16                        I.  INTRODUCTION

17         Petitioner, Pao Lo, is a state prisoner proceeding with a petition for writ of habeas corpus

18   pursuant to 28 U.S.C. § 2254.  Petitioner is currently serving a sentence of twenty-eight years to

19   life after being convicted by a jury of four counts of assault with a semiautomatic firearm, one

20   count of shooting at an occupied motor vehicle, one count discharging a firearm from a vehicle

21   and enhancements for infliction of great bodily injury and personal intentional use of a firearm.

22   Petitioner raises several claims in this federal habeas petition; specifically:  (1) prosecutorial

23   misconduct during the prosecutor's examination of a witness ("Claim I"); (2) prosecutorial

24   misconduct for deliberately introducing inadmissible evidence ("Claim II"); (3) prosecutorial

25   misconduct for statements made by the prosecutor during closing argument ("Claim III");

26   ineffective assistance of counsel for failing to object to the prosecutor's actions in Claims I-III

1

1  ("Claim IV"); (5) the cumulative effect of Claims I-IV rendered Petitioner's trial fundamentally

2  unfair and violated his due process rights ("Claim V"); (6) ineffective assistance of appellate

3  counsel for failing to raise the issue of the prosecutor's misconduct in Claim II on appeal based

4  on federal law ("Claim VI"); (7) the prosecutor violated Batson v. Kentucky, 476 U.S. 79 (1986)

5  when he systematically struck four potential jurors on the basis of their Asian race ("Claim VII");

6  and (8) ineffective assistance of appellate counsel for failing to present Claim VII on direct

7  appeal ("Claim VIII").  For the following reasons, the habeas petition should be granted.

8  II.  FACTUAL AND PROCEDURAL BACKGROUND[1]

9  On a late September evening in 2001, a group of young people
   staged street races on Stockton city streets.  The spectators
10 included Kukav Thao, his brother Chuck Thao, Chao Lee, and
   Amanda V.  Kukav and Chuck participated in the race, driving
11 Chuck's black Acura.  Around midnight, defendant arrived in a
   black Mazda pickup truck.

12 Defendant's arrival prompted a mass exodus, with Kukav, Chuck,
13 Chao and Amanda scrambling to their cars.  As they sped off,
   defendant followed in the pickup.  Leaning out of the passenger
14 window, defendant fired several shots, striking Kukav's car.  One
   bullet slammed through the car's bumper and into Kukav's right
15 buttock.

16 An information charged defendant with four counts of assault with
   a semiautomatic firearm, one count of shooting at an occupied
17 vehicle, and one count of discharging a firearm from a vehicle.  In
   addition, the information alleged infliction of great bodily injury (§
18 12022.7, subd. (a)), use of a firearm (§ 12022.5, subd. (a)(1)), and
   intentional and personal discharge of a firearm (§ 12022.53, subd.
19 (d)).

20 A jury trial followed . . .

21 *Kukav Thao's testimony*

22 Kukav Thao knew defendant for about a year prior to the incident.
   Kukav accompanied his brother Chuck and friends Lee and
23 Amanda to the impromptu racing site, a public street in Stockton.
   Kukav and Chuck raced Chuck's Acura Integra about two times

24

25     [1] The factual background is taken from the California Court of Appeal, Third Appellate
   District opinion on direct appeal dated August 18, 2003 and filed in this court on May 17, 2006
26 by the Respondent as lodged document number 3 (hereinafter the "Slip Op.").

2

each.  Fifty to 70 cars descended upon the makeshift racetrack, surrounded by crowds of onlookers.

Late in the evening, Kukav noticed defendant's arrival as a passenger in a black Mazda pickup.  Kukav could not see the driver.  Defendant stared and smiled at Kukav as the truck passed by.

Prior to that evening, Kukav had witnessed at least two arguments between defendant and Lee over a girl, Mercy Heu.

Frightened, Kukav left the racetrack in the Acura and drove toward Highway 99.  At an intersection, Kukav stopped behind a truck with Lee, Chuck and Amanda following behind in a Honda Civic.  At the intersection, the Honda pulled up beside Kukav's car.  Chuck jumped out of the Honda and began yelling that defendant was behind them with a gun.

Kukav saw defendant hanging out of the passenger window of the truck with a gun in his right hand.  Chuck jumped into the Acura.  Kukav heard several gunshots and saw a flash but was unsure whether the shots rang out before or after Chuck got in the car.  Kukav sped away, following behind Lee and Amanda in the Honda.  When the cars pulled over, Kukav discovered a bullet wound in his right buttock.  There was some discrepancy as to who took Kukav to the hospital and how they traveled.

Kukav denied drinking or using drugs the night of the shooting.  However, he admitted taking "Ecstasy" the previous evening.  A urinalysis of a sample taken from Kukav following the incident revealed the use of Ecstasy within one to three days and marijuana within one to 60 days.  No blood test was performed.

*Chao Lee's testimony*

Chao Lee had known defendant for his entire life.  Lee had been dating Mercy Heu for approximately two weeks prior to the shooting.  Defendant dated Heu for four or five years prior to her relationship with Lee.

Before the shooting, defendant called Lee twice at home and told Lee to "back off" and "stay away from" Heu.  Lee recognized defendant's voice.  Defendant also approached Lee at his workplace and talked to him about Heu.  Lee testified at the preliminary hearing that he told friends and his parents about the calls but not law enforcement.  Later, at trial, Lee recalled telling Detective Molthen about the telephone calls and workplace visits.  The night of the shooting, Lee accompanied Kukav and Amanda to the street race in the Honda.  Chuck drove the Acura.  However, Lee testified no one in their group raced that evening.

Lee saw defendant riding as a passenger in the Mazda truck, a vehicle he had seen in front of defendant's house a few times. As defendant drove by, he looked at Lee. The truck drove on, then made a U-turn and drove back toward Lee.

Lee said "Let's go" and got into the Honda with Chuck and Amanda. Lee knew something bad might happen, so he told everyone to leave. Kukav drove away in the Acura, stopping at an intersection behind a truck. Lee followed in the Honda with the Mazda truck directly behind.

Chuck got out and went to Kukav's car. Lee looked in his rearview mirror and heard eight gunshots. Lee drove off, and when the group gathered again he discovered Kukav had been shot. Although he had a cellular telephone, Lee did not call the police. Lee testified that on the night of the shooting, no one in the group had been gambling, drinking, or taking drugs. Lee admitted using Ecstasy the previous evening.

*Amanda V.'s Testimony*

Sixteen-year-old Amanda V. married Kukav in a Hmong ceremony. Amanda accompanied Kukav, Chuck, and Lee to the street racing. Amanda heard Chuck tell everyone to leave but did not see the Mazda truck pass by. After they passed the intersection, Amanda heard four or five gunshots, but it was dark and hard to see. She saw two occupants in the black truck. Amanda did not know where the gunshots originated.

*Chuck Thao's Testimony*

Chuck Thao, Kukav's brother, testified. Chuck knew defendant by his street name, "Screech." Chuck knew Lee's girlfriend had dated defendant prior to dating Lee.

Chuck drove his Acura to the street race the night of the shooting. Both Chuck and Kukav raced. Defendant drove by in a truck and looked out the window directly at Chuck. At the preliminary hearing, Chuck testified defendant was cursing and yelling. Chuck could not see the driver of the truck.

After spotting defendant, Chuck ran and told Kukav that Screech was coming. Chuck said, "Let's get out of here." He ran to the Honda and told Lee, "Let's go." Chuck saw the truck and saw defendant pop his head and the top part of his body out of the passenger window. Chuck saw defendant holding a gun and heard six or seven gunshots. Defendant shot once before Chuck ducked down in the car. Kukav told Chuck he had been shot.

The next morning, Chuck found bullet holes in the car. He also found a bullet in the vehicle, which he later turned over to police.

4

1      *Mercy Heu's Testimony*

2      Mercy Heu previously dated defendant and had known him for five
years. They ceased dating by mutual agreement. Heu began dating
3      Chao Lee in September 2001, and the pair continued to date.

4      Lee received a crank telephone call at his family home. At the Lee
family's request, Heu listened to the tape of the call. She believed
5      the caller was not defendant; she did not recognize the voice. Heu
told Lee the caller could not have been defendant because at the
6      time of the call defendant had been with her. Heu later stated the
voice might have been that of one of defendant's friends.

7

8      The night of the shooting, Heu went to defendant's birthday party.
She later went out with Lee. Heu was at her mother's house when
9      she learned of the shooting. When she asked Lee who had shot at
them, Lee replied, "'You should know who.'"

10      About two weeks before the shooting, defendant gave Heu a gun
for protection. Heu described the gun as heavy and about a foot
11      long. She asked defendant to take the gun back, but she was not
home when the gun disappeared. Heu told no one about the gun
12      until a week before the trial.

13      Heu still cared about defendant. Defendant did not tell her he
wanted them to get back together and asked if she was happy with
14      Lee. Heu visited defendant in jail until Lee found out and became
angry.

15

16      *Mai Vang's Testimony*

17      Mai Vang testified defendant celebrated his birthday with some
friends at her apartment on the night of the shooting. Defendant
never left the party. He stayed up all night, got drunk, and was
18      sick. Defendant was never out of her sight. Defendant dated other
women after breaking up with Heu.
19

20      On a previous occasion, Kukav falsely accused defendant's brother
and some of his friends of beating him. Vang knew Kukav lied
because defendant's brother had been with her when the beating
21      allegedly took place. Vang believed Kukav concocted the story out
of jealousy.
22

23      Vang had taken Ecstasy with Kukav on numerous occasions.
Kukav raced cars while under the influence of Ecstasy.

24      *Chang Her's Testimony*

25      Chang Her, defendant's brother-in-law, attended the birthday party
for defendant and remained until the following morning.
26      Defendant was at the party when Her arrived in the early evening.

1   Defendant got very drunk and threw up before passing out on the
    floor.  Defendant and the other revelers drank and went outside
2   only to smoke.

3   *Defendant's Testimony*

4   Defendant testified he knew Heu for four or five years.  Defendant
    never gave Heu a gun.  Nor did he telephone Lee or confront Lee at
5   his work about Heu.  Defendant no longer cared for Heu and did
    not care if she dated others.

6
    Defendant celebrated his birthday the night of the shooting.  He
7   drank beer and played cards with his friends.

8   On the evening of the shooting, defendant's car was in the shop for
    a paint job.  Defendant's brother-in-law owns a black truck.
9   However, defendant did not drive the truck on the night of the
    shooting.  Defendant denied any responsibility for the shooting.
10  Defendant knew nothing about the shooting until his arrest.  He
    never saw Kukav or Chuck prior to their testimony against him in
11  court.  Defendant believed Lee accused him of the shooting
    because he had previously dated Heu.  Defendant owned a shotgun
12  that he used for squirrel hunting.

13  (Slip Op. at p. 1-8.)

14       The jury convicted Petitioner on all counts and found each of the enhancements true.  On

15  direct appeal to the California Court of Appeal, Petitioner raised two issues; specifically:  (1) the

16  prosecutor committed misconduct "in questioning a witness, Mercy Heu, concerning a phone call

17  allegedly made to the witness by someone acting on Appellant's behalf" (Resp't's Lodged Doc.

18  1 at p. 25.); and (2) there was insufficient evidence to support the convictions.  (See id. at p. 34.)

19  On August 18, 2003, the California Court of Appeal rejected both of these claims in a written

20  opinion.

21       In Petitioner's petition for review to the California Supreme Court on direct appeal, he

22  only raised the issue of prosecutorial misconduct.  On October 29, 2003, the California Supreme

23  Court summarily denied the petition for review.

24       In January 2004, Petitioner filed an application in the County of San Joaquin Superior

25  Court for an order directing that a transcript be made of the voir dire proceedings.  (See Resp't's

26  Lodged Doc. 15 at Ex. A.)  The Superior Court denied the application on January 26, 2004

                                          6

1   without explanation.

2        Petitioner then filed a state habeas petition in the County of San Joaquin Superior Court

3   on February 24, 2004.  Petitioner raised the claims that he raises in his federal petition in that

4   state habeas petition amongst others.  In that state habeas petition, Petitioner once again

5   requested that a transcript of the voir dire proceedings be made as it was "necessary for a full and

6   fair adjudication of [the Batson] claim."  (Resp't's Lodged Doc. 15 at p. 37.)  Petitioner also

7   requested an evidentiary hearing.  (See id. at p. 39 "Petitioner is aware that he is required to

8   provide copies of reasonably available documentary evidence, including pertinent portions of the

9   voir dire proceedings, to support this claim.  However, petitioner's diligent effort to gain access

10  to that record was summarily rejected by the court.  Accordingly, petitioner cannot be held

11  responsible nor be penalized for this failure.  Taken as true, the facts in support of this Ground

12  meet the basic requirement for issuance of an Order to Show Cause.  Petitioner respectfully

13  submits that this Court must issue such an order, and prays that upon its issuance petitioner be

14  provided with a copy of the transcript of the voir dire proceedings held on March 6 and 7, 2002,

15  and allowed an evidentiary hearing as required for a full and fair adjudication of this issue.").)

16  On March 18, 2004, the San Joaquin Superior Court denied Petitioner's state habeas petition in a

17  written opinion.

18        Petitioner then raised the claims he raises in this federal petition in a state habeas petition

19  to the to the California Court of Appeal on April 1, 2004.  (See Resp't's Lodged Doc. 13.)  Once

20  again, Petitioner requested that a transcript of the voir dire proceedings be made so that there

21  could be a full and fair adjudication of the Batson issue.  (See id. at p. 37.)  Petitioner also

22  requested an evidentiary hearing.  (See id. at p. 39.)  The California Court of Appeal summarily

23  denied the petition on April 29, 2004.  (See Resp't's Lodged Doc. 14.)

24        Petitioner then filed a habeas petition in the California Supreme Court in May 2004 (See

25  Resp't's Lodged Doc. 6.)  Petitioner raised the claims that he raises in this federal habeas petition

26  to the California Supreme Court.  Petitioner requested that a transcript of the voir dire

7

1  proceedings be made.  (See id. at p. 37.)  Petitioner again requested an evidentiary hearing.  (See

2  id. at p. 39.)  The California Supreme Court summarily denied this habeas petition on April 13,

3  2005.  (See Resp't's Lodged Doc. 7.)

4       Petitioner filed this federal habeas petition on September 1, 2005.  On May 17, 2006,

5  Respondent answered the petition.  In his answer, Respondent admitted that Petitioner had

6  exhausted his state remedies on all of his claims.  (See Resp't's Answer at p. 2.)

7       On January 20, 2010, Magistrate Judge Moulds ordered that Respondent provide

8  Petitioner with a complete transcript of the jury voir dire proceedings from Petitioner's criminal

9  trial.  Subsequently, on February 9, 2010, Chief Judge Ishii reassigned the matter from

10  Magistrate Judge Moulds to Magistrate Judge Newman due to his recent appointment.

11       On March 15, 2010, Respondent lodged a copy of the jury voir dire proceedings in this

12  court.  Magistrate Judge Newman then ordered the parties to file further briefing on Petitioner's

13  Batson claim on August 23, 2010.  The parties filed their supplemental briefs addressing the

14  Batson claim on October 20, 2010.  In his supplemental brief, Respondent argued for the first

15  time that Petitioner's Batson claim was procedurally barred and not properly exhausted.

16  Alternatively, Respondent argued that Petitioner's Batson claimed lacked merit.

17       This matter was reassigned by Chief Judge Ishii to the undersigned on November 22,

18  2010.  On December 14, 2010, Petitioner filed a response to Respondent's supplemental Batson

19  brief opposing Respondent's procedural bar and non-exhaustion arguments.  Respondent filed a

20  reply to Petitioner's response on January 4, 2011.

21       On February 16, 2011, an evidentiary hearing was ordered on Claims VII and VIII.  It was

22  determined that 28 U.S.C. § 2254(e)(2) did not preclude an evidentiary hearing because

23  Petitioner had not failed to develop the record in the state court proceedings.  As outlined above,

24  he repeatedly and at every level of the California courts requested an evidentiary hearing and a

25  copy of the voir dire transcript so that he could fully assert the Batson issue.

26       An evidentiary hearing on Claims VII and VIII was conducted on March 16, 2011.  At the

8

evidentiary hearing, testimonial evidence was received from Petitioner, Ms. Katherine Hart (Petitioner's direct appellate counsel) as well as Mr. Michael Rasmussen (the trial prosecutor). Additionally, three documents were admitted into evidence, two letters from Petitioner to Ms. Hart and a declaration from Mr. Rasmussen.

On April 4, 2011, the United States Supreme Court issued its decision in <u>Cullen v. Pinholster</u>, 131 S.Ct. 1388 (2011). Subsequently, the parties were ordered to file supplemental briefs addressing what impact (if any) the Supreme Court's <u>Pinholster</u> decision had on this case in light of the evidentiary hearing that was conducted on March 16, 2011. The parties filed their <u>Pinholster</u> supplemental briefs on June 6, 2011. The entire matter is now ripe for adjudication.

## III.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

An application for writ of habeas corpus by a person in custody under judgment of a state court can only be granted for violations of the Constitution or laws of the United States. <u>See</u> 28 U.S.C. § 2254(a); <u>see also</u> <u>Peltier v. Wright</u>, 15 F.3d 860, 861 (9th Cir. 1993); <u>Middleton v. Cupp</u>, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing <u>Engle v. Isaac</u>, 456 U.S. 107, 119 (1982)). Petitioner filed this petition for writ of habeas corpus after April 24, 1996, thus the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies. <u>See</u> <u>Lindh v. Murphy</u>, 521 U.S. 320, 326 (1997). Under AEDPA, federal habeas corpus relief is not available for any claim decided on the merits in the state court proceedings unless the state court's adjudication of the claim:  (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court. <u>See</u> 28 U.S.C. 2254(d). Where a state court provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether the state court was objectively unreasonable in its application of clearly established federal law. <u>See</u> <u>Musladin v. Lamarque</u>, 555 F.3d 830, 835 (9th Cir. 2009); <u>see also</u> <u>Delgado v. Lewis</u>, 223 F.3d 976, 981-82 (9th Cir. 2000), <u>overruled</u> <u>on</u> <u>other</u> <u>grounds</u>, <u>Lockyer v.</u>

1   Andrade, 538 U.S. 63 (2003).  If a state court's decision does not meet the criteria set forth in §

2   2254(d), a reviewing court must conduct a de novo review of a habeas petitioner's claims.  See

3   Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may

4   not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we

5   must decide the habeas petition by considering de novo the constitutional issues raised.")

6       As a threshold matter, this Court must "first decide what constitutes 'clearly established

7   Federal law, as determined by the Supreme Court of the United States.'"  Lockyer, 538 U.S. at 71

8   (quoting 28 U.S.C. § 2254(d)(1)).  "'[C]learly established federal law' under § 2254(d)(1) is the

9   governing legal principle or principles set forth by the Supreme Court at the time the state court

10  renders its decision.'"  Id. (citations omitted).  Under the unreasonable application clause, a

11  federal habeas court making the unreasonable application inquiry should ask whether the state

12  court's application of clearly established federal law was "objectively unreasonable."  See

13  Williams v. Taylor, 529 U.S. 362, 409 (2000).  Thus, "a federal court may not issue the writ

14  simply because the court concludes in its independent judgment that the relevant state court

15  decision applied clearly established federal law erroneously or incorrectly.  Rather, that

16  application must also be unreasonable."  Id. at 411.  Although only Supreme Court law is binding

17  on the states, Ninth Circuit precedent remains relevant persuasive authority in determining

18  whether a state court decision is an objectively unreasonable application of clearly established

19  federal law.  See Clark v. Murphy, 331 F.3d 1062, 1070 (9th Cir. 2003) ("While only the

20  Supreme Court's precedents are binding . . . and only those precedents need be reasonably

21  applied, we may look for guidance to circuit precedents.").

22      The first step in applying AEDPA's standards is to "identify the state court decision that

23  is appropriate for our review."  See Barker v. Fleming, 423 F.3d 1085, 1091 (9th Cir. 2005).

24  When more than one court adjudicated Petitioner's claims, a federal habeas court analyzes the

25  last reasoned decision.  Id. (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).  The last

26  reasoned decision with respect to Claim II is from the California Court of Appeal in its decision

1    on direct appeal.[2]  With respect to Petitioner's remaining claims, the last reasoned decision was

2    from the Superior Court of California, County of San Joaquin as the California Court of Appeal

3    and the California Supreme Court both issued summary denials on Petitioner's state habeas

4    petitions.  See Ylst, 501 U.S. at 803-04.

5                    IV.  ANALYSIS OF PETITIONER'S CLAIMS

6        A.  Claim I

7            Petitioner argues in Claim I that the prosecutor committed misconduct when he attempted

8    to elicit from several witnesses that other witnesses lied in their trial testimony.  He also argues

9    that the prosecutor committed misconduct during his closing argument when he stated that the

10   defense witnesses had called each other liars during trial.  In denying this Claim, the Superior

11   Court of California, County of San Joaquin found that "[w]ith regard to the cross-examination

12   and closing argument, the petition suggests the defense counsel did not object at trial.

13   Accordingly, any objection was waived.  In re Dixon (1953) 41 C[al]. 2d 756; see also In re

14   Fudge, 2003 Cal.LEXIS 8709."  (Resp't's Lodged Doc. 16 at p. 1.)

15           In his answer, Respondent argues that this Claim should be denied on the merits and does

16   not assert any procedural default defense.  Therefore, any procedural default argument with

17   respect to Claim I would be deemed waived.  See Trest v. Cain, 522 U.S. 87, 89 (1997)

18   (explaining that procedural default is not jurisdictional and can be waived).  In any event,

19   because Claim I does not succeed on the merits as explained infra, any procedural default

20   argument need not be reached.  See Lambrix v. Singletary, 520 U.S. 518, 525 (1997) (explaining

21   that a district court may address the merits without reaching procedural issues where the interests

22   of judicial economy are best served by doing so).  Because the state courts never reached the

23

24           [2] The Superior Court of California, County of San Joaquin denied Claim II in Petitioner's
     state habeas petition explaining that Petitioner had raised this claim on direct appeal and it was
25   denied, citing to In re Waltreus, 62 Cal. 2d 218, 255, 42 Cal. Rptr. 9, 397 P.2d 1001 (1965).
     However, a federal court looks through a denial based on Waltreus to the previous state court
26   decision.  See Forrest v. Vasquez, 75 F.3d 562, 564 (9th Cir. 1996).

1   merits of this Claim, de novo review applies to Claim I.  See Pirtle v. Morgan, 313 F.3d 1160,

2   1167 (9th Cir. 2002) (applying de novo review where state courts did not reach the merits of a

3   claim).

4           The purported prosecutorial misconduct centers around the prosecutor's cross-

5   examination of Petitioner's alibi witnesses.  On direct examination, Mai Vang testified that on

6   September 28, 2001, she attended a party in which Petitioner was present that lasted well into the

7   early morning hours of September 29, 2001.  She testified that Petitioner never left the party that

8   evening.  (See Reporter's Tr. at p. 686.)  Lou Yang and Chang Her gave similar testimony on

9   direct examination.  (See id. at p. 773, 793.)

10          On cross-examination of Mai Vang, the following colloquy took place between Mai Vang

11  and the prosecutor:

12              Q:  And how many times have you met with Jeff Silvia at his
                office?
13              A:  Several times.
                Q:  And who else was present when you met with Jeff Silvia?
14              A:  David, Chang, Lou and I . . . .
                Q:  And this – how many times total have you gone over what you
15              were going to testify to with Mr. Silvia?
                A:  I'd say about five, six times.
16              Q:  Okay.  And how many of those times was Chang Her present?
                A:  I'd say most of the time, yes.
17              Q:  Was he there last night?
                A:  No.
18              Q:  David Lo, how many times was Bomb present when you went
                over your testimony?
19              A:  He was there?
                Q:  Every time?
20              A:  Yes.
                Q:  Was he there last night?
21              A:  Yes.
                Q:  And Louis Yang, or – is it Louis?
22              A:  Lou.
                Q:  Lou.  Was he present last night?
23              A:  No.
                Q:  How many times was he present when you went over your
24              testimony with Mr. Silvia?
                A:  Every time except last night.
25

26  (Id. at p. 687-88, 703.)

The following colloquy took place between the prosecutor and Lou Yang on cross-examination:

> Q:  So if Mai Vang came in here and said that each time you guys got together you went over what you were going to testify in the case, she'd be lying?
> A:  All I'm – all I know is that every time we go there, we just talk about the case, how it's going, most of the time.
> Q:  So would Mai Vang be lying if she testified under oath that every time that she went over Mr. Silvia's office with everyone, that she went over what she was going to testify to, would that be a lie?
> A:  Well, I don't know what she basically testified to so I don't really know if she was lying.
> Q:  What she knew about the case.  Where she was the night of the shooting, would that be a lie?
> A:  But she just told Mr. Silvia where she was.
> Q:  Each time that she went and met with Mr. Silvia?
> A:  We didn't really talk about everything.  I mean –
> Q:  You are testifying you only did that one time?
> A:  Yep.
> Q:  What was the date of that time?
> A:  That was the first time when I met up with Mr. Silvia . . . .
> Q:  And what about Mai Vang, Mai Vang only said one time what she was doing the night of the shooting when she went over to Mr. Silvia's office?
> A:  A lot of times she goes by herself, so I'm not sure.
> Q:  Well, if she testified that every time she went over there, that you were present, would that be a lie?
> A:  There's like one or two time – I'm not sure, but I was there like four or five times when she was there.
> Q:  Okay.  Of those four and five times, how many times did she go over what she was doing the night of the shooting?
> A:  I'm – she was just talking about how they accuse her of whatever she was doing.
> Q:  How many times did he go over where she was the night of the shooting of those four or five times that you were present?
> A:  As I recall, once.
> Q:  So if she testified that she went where she was the night of the shooting every single time, she would be lying?
> A:  I don't know what she testified to, so I can't say if she was lying or not.
> Q:  But if she did testify to that, would that be a lie?
> A:  I guess so . . . .
> Q:  If Nahi Moua said that every time he went over Jeff Silvia's everyone was there, you, Mai, David, and Chang, and that each of the four to five times that he went there, he heard what you had to say, where you were the night of the shooting, would that be a lie?
> A:  Yeah, I guess it would be a lie.
> Q:  Okay.  If he testified that he heard what Mai Vang was going to

1     testify to every time he went to Jeff Silvia's office, four or five
    times, that would be a lie?
2     A: I guess so.
    Q: And if Mai Vang said those things, she would be lying, too?
3     A: Yeah.
    Q: So Mai Vang is a liar?
4     MR. SILVIA: Objection, Your Honor.
    THE COURT: Sustained.

5

6 (Id. at p. 775-76, 777-78, 786.)

7     The following colloquy took place between the prosecutor and Chang Her on cross-

8 examination:

9     Q: If she [Mai Vang] testified under oath that every time she went
    to Mr. Silvia's office that she heard what you were going to say
10     and what you were – where you were on 9-28, the night of the
    shooting, would she be lying?
11     Q: Say that again.
    Q: Okay. I know it's long.
12     A: Yeah.
    Q: If Mai –
13     Q: Uh-huh.
    Q: – testified under oath that she was present four or five times at
14     Mr. Silvia's office and heard what you were going to say about
    where you were 9-28 –
15     A: Uh-huh.
    Q: – would she be lying?
16     A: Do you think she's lying?
    Q: I'm asking you.
17     A: I don't really know.
    Q: Well you are saying that you only met with Mr. Silvia and went
18     over what you were going to say one time, correct?
    A: Uh-huh.
19     Q: You only met at Mr. Silvia's office and said what you were
    going to testify to on your whereabouts on 9-28 one time, correct?
20     A: Yes.
    Q: Okay. If Mai came in here and testified under oath that she
21     heard you at Mr. Silvia's office with Mr. Silvia present and
    everyone present four or five times say what you were going to
22     testify to, would that be a lie?
    A: Would that be a lie?
23     Q: Yes.
    A: No – yeah.
24     Q: It would be a lie?
    A: Yes.
25     Q: If Nhai Moua – do you know who Nhai Moua is?
    A: Yes.
26     Q: If he came in and testified under oath that he was present four

1    or five times at Mr. Silvia's office and heard what you were going
     to testify to on your whereabouts on 9-28, four or five times, would
2    that be a lie?
     A: Yes.
3    Q: So if they said those things, they are liars, is that what you are
     testifying to?
4    MR. SILVIA: Objection.
     THE COURT: I'll sustain it.
5    MR. RASMUSSEN: Q: If they testified that they – if Nhai Moua
     testified that he heard what Chang Her was going to testify to –
6    A: Uh-huh.
     Q: – several times at Mr. Silvia's office and you were present,
7    would that be a lie?
     A: I was present, what does that mean?
8    Q: That you were there.
     A: Uh-huh.
9    Q: And Nhai Moua testified that you were there and he heard what
     Chang Her was going to testify to four or five times –
10   A: Uh-huh.
     Q: – would that be a lie?
11   A: Would that be a lie? You are confusing me.
     Q: I'm sorry. I don't mean to confuse you.
12   A: Yeah.
     Q: Okay. If Nhai Moua testified . . . that he heard four or five
13   times what Chang Her was going to testify to at Mr. Silvia's office,
     and he also said that you were present, would that be a lie?
14   A: That I was there?
     Q: Yes.
15   A: There at the party you mean?
     Q: No, there at Mr. Silvia's office listening to what Chang Her
16   was going to testify to.
     A: Uh-huh.
17   Q: Would that be a lie?
     A: What do you mean by it's a lie?
18   Q: Not the truth. Mr. Silvia has told you what the truth is . . .
     hasn't he? You've gone over this several times. But you haven't
19   gone over your testimony but once, correct?
     A: Yes . . . .
20   Q: Now, if Mai testified that she heard what Lou was going to
     testify to four or five times, and at Mr. Silvia's office, and you
21   were present, would that be a lie?
     MR. SILVIA: Objection.
22   THE COURT: I'll sustain it.

23   (Id. at p. 807-10, 811).

24       Finally, during closing arguments, the prosecutor referred to his colloquies with these

25   witnesses when he argued to the jury that, "[t]he witnesses yesterday were even calling Nhai and

26   Mai – their testimony were lies if they said we testified four to five times at Jeff Silvia's office,

                                           15

1  that's not true.  You heard them say that."  (Id. at p. 948.)

2      The Petitioner argues that this questioning by the prosecutor on cross-examination and

3  comments during his summation amounted to prosecutorial misconduct to warrant the granting

4  of federal habeas relief.  A criminal defendant's due process rights are violated if prosecutorial

5  misconduct renders a trial "fundamentally unfair."  Drayden v. White, 232 F.3d 704, 713 (9th

6  Cir. 2000) (citing Darden v. Wainright, 477 U.S. 168, 183 (1986)).  A habeas petition will be

7  granted for prosecutorial misconduct only when the misconduct "so infected the trial with

8  unfairness as to make the resulting conviction a denial of due process."  Darden, 477 U.S. at 181

9  (internal quotation marks and citation omitted).  A determination that the prosecutor's

10  questioning was improper is insufficient in and of itself to warrant reversal.  See Ortiz v. Stewart,

11  149 F.3d 923, 934 (9th Cir. 1998).  Further, isolated comments by a prosecutor may be cured by

12  jury instructions.  See Sassounian v. Roe, 230 F.3d 1097, 1106-07 (9th Cir. 2000); see also Hall

13  v. Whitley, 935 F.2d 164, 165-66 (9th Cir. 1991) ("Put in proper context, the comments were

14  isolated moments in a three day trial.")  A claim of prosecutorial misconduct is analyzed under

15  the prejudice standard set forth in Brecht v. Abrahamson, 507 U.S. 619 (1993).  See Karis v.

16  Calderon, 283 F.3d 1117, 1128 (9th Cir. 2002) (stating that a claim of prosecutorial misconduct

17  is analyzed under the standard set forth in Brecht).  Specifically, the inquiry is whether the

18  prosecutorial misconduct had a substantial and injurious effect on the jury's verdict.  See

19  Johnson v. Sublett, 63 F.3d 926, 930 (9th Cir. 1995) (finding no prejudice from prosecutorial

20  misconduct because it could not have had a substantial impact on the verdict under Brecht).

21      With respect to improper prosecutorial comments during a closing argument, the law is

22  settled that under this due process standard, "[c]ounsel are given latitude in the presentation of

23  their closing arguments, and the courts must allow the prosecution to strike hard blows based on

24  the evidence presented and all reasonable inferences therefrom."  Ceja v. Stewart, 97 F.3d 1246,

25  1253-54 (9th Cir. 1996) (internal quotation marks omitted).  A reviewing court should consider a

26  prosecutor's allegedly improper statements in light of the realistic nature of trial closing

1  arguments.  "Because 'improvisation frequently results in syntax left imperfect and meaning less

2  than crystal clear,' 'a court should not lightly infer that a prosecutor intends an ambiguous

3  remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation,

4  will draw that meaning from the plethora of less damaging interpretations.'"  Williams v. Borg,

5  139 F.3d 737, 744 (9th Cir. 1998) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 647

6  (1974)).  A challenged or offering statement must also be evaluated in the context of the entire

7  trial, as well as the context in which it was made.  See Boyde v. California, 494 U.S. 370, 384-85

8  (1990).  Some factors to consider in determining the prejudicial effect of a prosecutor's

9  misconduct include:  (1) whether a curative instruction was issued, see Greer v. Miller, 483 U.S.

10  756, 766 n.8 (1987); (2) the weight of evidence of guilt, compare United States v. Young, 470

11  U.S. 1, 19 (1985) (finding "overwhelming evidence" of guilt), with United States v. Schuler, 813

12  F.2d 978, 982 (9th Cir. 1987) (requiring new trial after prosecutor referred to defendant's

13  courtroom demeanor, in light of prior hung jury and lack of curative instruction); (3) whether the

14  misconduct was isolated or part of an ongoing pattern, see Lincoln v. Sunn, 807 F.2d 805, 809

15  (9th Cir. 1987); (4) whether the misconduct relates to a critical part of the case, see Giglio v.

16  United States, 405 U.S. 150, 154 (1972); and (5) whether the prosecutor's comment misstates or

17  manipulates the evidence.  See Darden, 477 U.S. at 181-82.

18      A prosecutor may not ask a witness to comment on the truthfulness of another witness.

19  See United States v. Harrison, 585 F.3d 1155, 1158 (9th Cir. 2009), cert. denied, 130 S.Ct. 1556

20  (2010).  While the prosecutor's questions to the witnesses as outlined above regarding whether

21  other witnesses were lying were perhaps improper, it does not necessarily follow that these

22  questions (along with his remarks made during closing arguments on this issue) prejudiced

23  defendant so that they had a substantial and injurious effect on the jury's verdict.  The

24  prosecutor's questions regarding witnesses' meetings with defense counsel were a small portion

25  of the cross-examination of these witnesses.  Additionally, the jurors were instructed at length

26  about how they were the sole judges of believability of a witness; specifically, the trial judge

17

1   instructed the jury that:

2

> Evidence that at some other time a witness made a statement or statements that is or are inconsistent with his or her testimony in this trial may be considered by you not only for the purpose of testing the credibility of the witness, but also as evidence of the truth of the facts as stated by the witness on that former occasion. If you disbelieve a witness' testimony that he or she no longer remembers a certain event, that testimony is inconsistent with the prior statement or statements by him or her describing that event. Every person who testifies under oath is a witness. *You are the sole judges of the believability of a witness and the weight to be given the testimony of each witness.*
>
> In determining the believability of a witness, you may consider anything that has a tendency to prove or disprove the truthfulness of the testimony of the witness, including but limited to any of the following:
>
> The extent of the opportunity or ability of the witness to see or hear or otherwise become aware about the matter about which the witness testified;
>
> The ability of the witness to remember or communicate any matter about which the witness testified;
>
> The character and quality of that testimony;
>
> The demeanor and manner of the witness while testifying;
>
> The existence or non-existence of bias, interest or other motive;
>
> The existence or non-existence of any fact testified to by the witness;
>
> The attitude of the witness toward this action or toward the giving of testimony;
>
> A statement previously made by the witness that is consistent or inconsistent with his or her testimony;
>
> An admission by the witness of untruthfulness;
>
> The witness' prior conviction of a misdemeanor.
>
> A witness who was willfully false in one material part of his or her testimony is to be distrusted in others.  You may reject the whole testimony of a witness who willfully has testified falsely as to a material point unless, from all the evidence, you believe the probability of truth favors his or her testimony in other particulars.
>
> You are not bound to decide an issue of fact in accordance with the testimony of a number of witnesses which does not convince you, as against the testimony of a lesser number or other evidence which appeals to your mind with more convincing force.
>
> You may not disregard the testimony of the greater number of witnesses merely from caprice, whim or prejudice, or from a desire to favor one side against the other.
>
> You must not decide an issue by the simple process of counting the number of witnesses who have testified on the opposing sides.  The final test is not the relative number of witnesses, but in the convincing force of the evidence.
>
> Discrepancies in a witness' testimony or between a witness' testimony and that of other witnesses, if there were any, do not

1  necessarily mean that a witness should be discredited.  Failure of
   recollection is common.  Innocent misrecollection is not
2  uncommon.  Two persons witnessing an incident or a transaction
   often will see or hear it differently.  Whether a discrepancy pertains
3  to an important matter or something trivial should be considered by
   you.
4  The fact that a witness has been convicted of a misdemeanor, if
   this is a fact, may be considered by you only for the purpose of
5  determining the believability of that witness.  The fact of a
   conviction does not necessarily destroy or impair a witness'
6  believability.  It is one of the circumstances that you may take into
   consideration in weighing the testimony of that witness.
7  You should give the testimony of a single witness whatever weight
   you think it deserves.  Testimony by one witness which you believe
8  concerning any fact is sufficient for the proof of that fact.  You
   should carefully review all the evidence upon which the proof of
9  that fact depends.

10  (Reporter's Tr. at p. 1001-03 (emphasis added).)  Because the jury is presumed to have followed

11  its instructions, these instructions by the trial judge ameliorated any possible impropriety to

12  warrant federal habeas relief.  See Weeks v. Angelone, 528 U.S. 225, 234 (2000) (stating that a

13  jury is presumed to follow its instructions).  Furthermore, the trial court sustained defense

14  counsel's objections when he objected to the prosecutor asking witnesses whether other

15  witnesses were liars.  See, e.g., Cornoado v. Almager, Civ. No. 08-940, 2009 WL 2900288, at

16  *11 (C.D. Cal. Sept. 2, 2009) (even assuming prosecutor's questions to witnesses regarding

17  whether other witnesses were lying was improper, "Petitioner failed to show that the questions

18  deprived him of a fair trial, particularly where the trial court sustained several of defense

19  counsel's objections to the prosecutor's line of questioning.")  Thus, Petitioner failed to show

20  that the prosecutor's purported improper questioning warrants federal habeas relief.

21      Additionally, with respect to the Petitioner's argument that the prosecutor's statement

22  during closing arguments on this issue amounted to prosecutorial misconduct, the prosecutor's

23  simple reference that a witness's testimony may include a lie does not rise to the level of

24  prosecutorial misconduct.  See Turner v. Marshall, 63 F.3d 807, 818 (9th Cir. 1995), overruled

25  on other grounds, Tolbert v. Page, 182 F.3d 677 (9th Cir. 1999) (en banc).  Here, the case

26  centered primarily around the credibility of the witnesses.  The prosecutor was entitled to argue

1   that the opposing side was not telling the truth.  See United States v. Trevino, 419 F.3d 896, 902

2   (9th Cir. 2005).  The trial judge also specifically instructed the jury that, "[s]tatements made by

3   the attorneys during the trial are not evidence[.]"  (Reporter's Tr. at p. 997.)   For all of the

4   foregoing reasons, Petitioner failed to show that he is entitled to federal habeas relief on Claim I.

5          B.  Claim II

6          In Claim II, Petitioner argues that the prosecutor committed misconduct through the

7   deliberate introduction of inadmissible evidence in violation of the Sixth and Fourteenth

8   Amendments to the United States Constitution.  Specifically, Petitioner argues that the

9   prosecutor committed misconduct in his questioning of Mercy Heu.  The California Court of

10  Appeal analyzed this Claim on direct appeal and stated the following:

11             Defendant contends the prosecutor's questioning of Heu
                concerning the tape-recorded telephone call allegedly made by
12             defendant's confederate constituted prejudicial misconduct.  The
                trial court denied defendant's motion for a mistrial based on the
13             alleged misconduct . . .

14             During trial, defense counsel elicited testimony about a crank
                telephone call made to Lee's home.  Sometime prior to the
15             shooting, Heu went to Lee's house to listen to a tape recording of
                the telephone call.  Lee's parents wanted to determine whether
16             defendant was responsible for harassing telephone calls made to
                the Lee home.  Heu listened to the telephone call and told the Lees
17             the voice was not defendant's.

18             The defense went on to elicit testimony from Heu that she wrote to
                defendant in jail because "he's really a nice guy."  Heu testified
19             defendant was not violent; to the contrary, defendant did many
                good things from the kindness of his heart.  Ultimately, Heu
20             testified she did not feel defendant was capable of doing the
                shooting.

21
                During redirect, the prosecution again asked about the attempted
22             identification of the caller:
                "Q.  [Prosecutor]:  Did you recognize one of the voices on there?
23             "A.  [Heu]: I kind of had idea, but I'm not for sure if it's that
                person, too.
24             "Q.  Who was that person?
                "A.  Steven.
25             "Q.  Steven who?
                "A.  I think Xiong.
26             "Q.  Is this a friend of the defendant's?

                                        20

"A. Yes.
"Q. Hangs out with the defendant?
"A. Sometimes.
"Q. What did the tape say?"

At this point, defense counsel made a hearsay objection, which the trial court sustained. The prosecution continued:
"Q. You think you recognized the voice on that tape as a friend of the defendant's?
"A. Yes.
"Q. Was that person saying nice things?
"A. No.
"Q. Were they talking about Chao Lee?
"A. Yes.
"Q. And not saying nice things?"

Defense counsel again objected, and the trial court again sustained the objection.

Defense counsel moved for a mistrial based on prosecutorial misconduct and the failure to provide discovery. Defense counsel argued: "Now apparently the prosecutor is in possession of that tape [of the telephone call] or has obtained some information from some witnesses about the content of the conversation on that tape. And he has never shared any of that information with me. And if he had shared that information with me, we could have had an opportunity to litigate whether or not it was proper for him to bring up the contents of that tape before the jury, as he did. [¶] As it turned out, he indicates that there were some threats on that tape and I think that, under the circumstances, it was wholly inappropriate without having an opportunity to speak to the witness who told him what the contents of that tape was or listen to the contents of that tape. [¶] I think it's a critical issue in this case, whether or not [defendant] has ever been involved in any kind of threats towards this individual. And the prosecutor knows that that is critical information and should have shared that information with us. And the fact that he blurted out that there were threats on the tape, I think, is prosecutorial misconduct."

Defense counsel moved for a mistrial based on prosecutorial misconduct. Counsel noted the prosecution continued to ask about the contents of the tape after the trial court sustained the initial hearsay objection.

The prosecutor disclosed he did not possess a copy of the tape. The morning she testified, Heu came to his office. According to the prosecutor: "We asked how her interview last night with the defense investigator went. She said that they discussed a tape at one point. I asked her about the tape. She said the tape did not have . . . defendant's voice on it. She said that it had a voice that she recognized as one of the defendant's friends and they were

threatening to kill Chao Lee." The prosecution had not disclosed this information to the defense.

The trial court denied the motion for a mistrial, noting: ". . . I don't feel that the prejudicial effect of this is so great as would require a mistrial." To offset the effect of the evidence, the court admonished the jury: ". . . the jury is instructed to disregard any evidence concerning the contents of the alleged tape referred to by Mercy Heu. There is no connection that has been established between the defendant and the tape. And it would be inappropriate to take that into consideration when determining the guilty or innocence of the defendant."

The court later instructed the jury: "Yesterday, this Court ordered the prosecutor to refrain from questioning the witness, Mercy Heu, regarding the contents of a tape referred to by Mercy Heu. The prosecutor continued questioning the witness in this area in disregard of the Court's order. [¶] The Court has admonished the jury to disregard any evidence concerning the contents of the alleged tape referred to by Mercy Heu. There is no connection between the defendant and the tape and it would be inappropriate to take that into consideration when determining the guilt or innocence of the defendant."

Defense counsel moved for a new trial based on prosecutorial misconduct. The court declined to label the episode prosecutorial misconduct, noting: "I just don't think it was significant what came out that the jury heard. And if there was any error, I think it was remedied by the admonition to the jury and the instruction. [¶] Obviously, we can't have a perfect trial every time. The question is was it a fair trial? And I don't think this was something that was malicious on the part of the district attorney or intentional. [¶] I'm not going to characterize it as prosecutorial misconduct. If anything . . . it was an error and I don't think that rises to that level. [¶] The question is is there a reasonable probability that a result more favorable to the defendant would have occurred had the district attorney not asked those questions. And I think the answer is no. [¶] So I don't think that that was a significant error. I don't think that it required a mistrial. And I also don't think it requires a new trial."

Defendant disagrees with the trial court's assessment of the impact of the prosecution's probing about the telephone call tape. According to defendant, irreparable prejudice resulted from the prosecutor's "insinuation" that one of defendant's friends previously had threatened Lee. The objectionable questions bolstered the prosecution's theory that defendant, jealous of Heu's relationship with Lee, avenged himself by firing at Lee and his companions. Therefore, the trial court erred in denying both the motion for a mistrial and the motion for a new trial. A prosecutor's conduct violates the federal Constitution when it

forms a pattern of conduct so egregious that it taints the trial with such unfairness as to make the conviction a denial of due process. In turn, the conduct of the prosecution offends the state Constitution if it involves the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.  When the claim focuses upon the prosecution's comments before the jury, the question is whether there is a reasonable likelihood the jury construed or applied any of the challenged remarks in an objectionable fashion.  (People v. Ayala (2000) 23 Cal.4th 225, 283-284.)

The People contend the prosecutor asked the questions in good faith since defense counsel introduced the issue during Heu's direct examination.  In addition, the prosecutor told the court that when Heu came to his office that morning, she told him she had met the night before with defense counsel and the defense investigator. Heu told the prosecutor she discussed the tape with the defense team.

While the prosecutor's initial questions regarding the tape may have been asked in good faith, the court was troubled, as are we, by the continuing questioning *after* the court sustained defense counsel's objection.  As the court noted, the prosecutor, after the court sustained the initial objection, persisted in "asking a question of a leading nature, implying that there were threats on the tape." However, we do not find the prosecutor's continuation of the questioning prejudicial.  The court sustained defense counsel's objection, immediately admonished the jury to disregard the evidence, and specifically noted the prosecution's failure to refrain from further questioning Heu about the tape.

The court later instructed the jury that no connection existed between defendant and the tape and admonished the jury not to consider Heu's comments about the tape.

The court's actions removed any possibility of prejudice.  As the Supreme Court noted in evaluating prejudice in a similar situation:  "Defendant argues that the prosecutor committed misconduct for the reasons cited by the trial court in sustaining the objection below.  We need not decide the issue, however, because the incident clearly could not have been prejudicial under the circumstances.  Specifically, the court intervened as soon as an objection was made.  The court also admonished the jury in terms favorable to the defense at the first available opportunity . . . and it made clear that the incident had no bearing on the guilt determination.  We can only assume that the jury followed the instruction, and that any conceivable harm was prevented as a result."  (People v. Millwee (1998) 18 Cal.4th 96, 140.) The trial court properly denied defendant's motions for a mistrial and a new trial.

1 (Slip Op. at p. 11-17.)

2      The denial of this Claim did not amount to an unreasonable application of clearly

3 established federal law.  As noted by the California Court of Appeal, the trial court sustained

4 defense counsel's objection regarding the prosecutor's questions regarding the purported threats

5 made on the tape and admonished the jury to disregard "any evidence concerning the contents of

6 the alleged tape referred to by Mercy Heu.  There is no connection that has been established

7 between the defendant and the tape and it would be inappropriate to take that into consideration

8 when determining the guilt or innocence of the defendant."  (Reporter's Tr. at p. 769.)  For the

9 reasons discussed in the California Court of Appeal decision (most notably the trial court's

10 actions in sustaining the defendant's objections, the curative instruction given to the jury at that

11 time and the jury instructions themselves which included another curative instruction, see Weeks

12 528 U.S. at 234 (a jury is presumed to follow the court's instructions)), Petitioner's prosecutorial

13 misconduct argument in Claim II is without merit as he failed to show that if any purported error

14 occurred it had a substantial and injurious effect on the jury's verdict.  He is not entitled to

15 federal habeas relief on this Claim and Claim II should be denied.

16     C.  Claim III

17      In Claim III, Petitioner makes several additional prosecutorial misconduct arguments

18 arising from many of the prosecutor's statements during closing arguments.  Similar to Claim I,

19 the last reasoned decision on this Claim was from the Superior Court of California, County of

20 San Joaquin which viewed this Claim as waived due to Petitioner's failure to object to it during

21 trial.  As with Claim I, Respondent asserts this Claim should be denied on the merits, thereby

22 waiving any possible procedural default argument he may have.  Since there was no adjudication

23 on the merits of this Claim by the California state courts, the merits of the Claim will be

24 reviewed de novo.  Each of Petitioner's arguments within Claim III is considered in turn.

25        i.  Statement that Petitioner had a gun

26      First, Petitioner asserts that the prosecutor committed misconduct when he stated that

Mercy Heu told Chao Lee that Petitioner had a gun.  Petitioner states that Mercy Heu "told Chao Lee that petitioner had given her a gun.  There was no evidence that Mercy ever told ever told Chao that she did not still have the gun prior to the shooting."  (Pet'r's Pet. at p. 12.)  Thus, Petitioner asserts the following statement by the prosecutor during closing argument amounted to misconduct:

> You heard from Mercy.  Mercy told Chao the defendant had a gun.
> Chao knew the defendant had a gun and he wanted out of there, he
> wanted out of there quick. . . .
>
> She [Mercy] also testified that the defendant had a gun, a big gun,
> not a revolver.  The defendant gave it to her a week or two before
> the shooting and she told Chao that the defendant had given her a
> gun and she was nervous about it.  She called the defendant and
> said, "Pick up your gun, I don't want it."  She never saw it
> again.  [¶]  Chao knew the defendant had a gun.  That's what
> Mercy testified to.

(Reporter's Tr. at p. 936, 940.)  Respondent admits that there was no explicit testimony at trial that Mercy Heu told Chao Lee that Petitioner had a gun just before the shooting.  (Resp't's Answer at p. 32.)  Respondent argues that the prosecutor did not commit misconduct because he was allowed reasonably wide latitude to argue reasonable inferences from the evidence.  The Respondent also argues that Petitioner failed to show that he was prejudiced by any misstatement of the record by the prosecutor on this issue during his closing argument.

A prosecutor is entitled to argue reasonable inferences from the evidence.  See Duckett v. Godinez, 67 F.3d 734, 742 (9th Cir. 1995).  As previously noted, "[c]ounsel are given latitude in the presentation of their closing argument, and courts must allow the prosecution to strike hard blows based on the evidence presented and all reasonable inferences therefrom."  Ceja, 97 F.3d at 1253-54.  Here, even if the prosecutor's statements regarding Chao Lee purportedly knowing that Petitioner had a gun went beyond a proper inference from the evidence, the statement did not "so infect [ ] the trial with unfairness."  Darden, 477 U.S. at 181.  The trial court specifically instructed the jurors that the statements from counsel were not evidence and that they were to decide the facts based solely on the evidence.  The jury is deemed to have followed the court's

25

1  instructions.[3]  See, e.g., Doe ex rel. Rudy-Glanzer v. Glanzer, 232 F.3d 1258, 1270 (9th Cir.

2  2000).  Thus, any purported error by the prosecutor would be deemed harmless under these

3  circumstances.  Petitioner is not entitled to federal habeas relief on this argument.

4           ii.  Statement that Petitioner was looking for and after Chao Lee

5       Next, Petitioner asserts that the prosecutor committed misconduct when he stated that

6  Petitioner "was looking for Chao Lee and he was going to shoot anyone that got in his way"

7  (Reporter's Tr. at p. 932.) and that "[n]ext we heard from Chao, the one the defendant was after."

8  (Id. at p. 935.)  Petitioner argues that no evidence supported these statements made by the

9  prosecutor during closing arguments.

10      As noted above, the prosecutor is entitled to wide latitude regarding inferences from the

11  evidence.  Here, Kukav Thao testified that he had previously seen Petitioner and Lee argue at

12  least two times over Mercy Heu.  (See id. at p. 45.)  Chao Lee had testified that Lee had

13  previously contacted him and told him to back off from seeing Heu.  (See id. at p. 207.)  One of

14  these contacts included Petitioner confronting Lee at work.  (See id. at p. 210.)  Thus, the

15  prosecutor could make these statements during closing argument given the wide latitude that is

16  allowed for a prosecutor to infer from the evidence adduced at trial.  Such comments by the

17  prosecutor do not amount to prosecutorial misconduct.  Additionally, even if the comments were

18  improper, they did not make the trial so fundamentally unfair such that they would be deemed

19  harmless under the Brecht standard.  To reiterate, the trial judge instructed the jury regarding

20  what constituted evidence and that the attorneys' statements were not evidence.  In this case, at

21  least two witnesses, (Kukav Thao and Chuck Thao) saw Petitioner fire his weapon.  (See id. at p.

22  60, 562.)  For the foregoing reasons, Petitioner is not entitled to federal habeas relief on this

23  prosecutorial misconduct argument.

24  _____

25      [3] In fact, the jury requested during its deliberations to have Chao Lee and Mercy Heu's
   testimony read back.  (See Reporter's Tr. at p. 1026.)  Thus, they clearly knew what each witness
26  testified to before coming up with their verdict.

iii.  Statement on Petitioner's hearing loss

Petitioner also argues that the prosecutor committed misconduct when he commented on Petitioner's hearing loss; specifically, the prosecutor stated during closing argument that petitioner "testified that he has poor hearing.  He didn't hear what was being said.  The poor hearing is from shooting guns, that's how you lose hearing."  (Reporter's Tr. at p. 952.)  The Respondent argues that it was legitimate to argue that being around gunfire can affect a person's hearing.  (See Resp't's Answer at p. 33.)  In his traverse, Petitioner asserts that, "[t]he problem with that argument [Respondent's argument] is that there was no evidence petitioner was 'around gunfire.'  The jury again likely attributed that statement to personal knowledge by the prosecutor, and that the prosecutor knew petitioner was involved with guns so much he lost his hearing."  (Pet'r's Traverse at p. 7-8.)   Contrary to Petitioner's assertion in his traverse, there was testimony from eyewitnesses that Petitioner's fired shots on the evening in question.  (See Reporter's Tr. at p. 60, 562.)  The prosecutor was permitted to make this inference from the evidence at trial given the record.  Furthermore, even if it was improper, it does not rise to a level necessary to grant federal habeas relief.  As noted previously, the jury was specifically instructed that statements from counsel were not evidence and the jury is deemed to have followed the court's instructions.  For the foregoing reasons, this prosecutorial misconduct argument also does warrant granting federal habeas relief.

iv.  Statement regarding Mercy Heu protecting Petitioner

Next, Petitioner argues that the prosecutor went beyond the permitted inferences in his rebuttal closing argument when he stated to the jury that Mercy Heu "wanted to protect [Petitioner].  That's why she delayed coming in here and telling us everything, but she did."  (Reporter's Tr. at p. 994.)  The Respondent asserts that the prosecutor made this reference because Mercy Heu did not testify at the preliminary hearing and that she still had feelings for the Petitioner.  (See Resp't's Answer at p. 33.)  During the trial, Mercy Heu testified that this was the first time that she testified under oath in this matter.  (See Reporter's Tr. at p. 745.)  She also

27

1  testified that she visited the Petitioner in jail several times.  (See id. at 733.)

2         The prosecutor's statements with respect to this issue fall into the category of inferences a

3  prosecutor is allowed to make during closing arguments.  Additionally, even assuming *arguendo*

4  that the statement was improper, the jury was instructed that counsel's statements are not

5  evidence that are to be considered by the jury in making their findings and that they alone judge a

6  witness' credibility.  Thus, any purported error would be deemed harmless under these

7  circumstances.

8                  v.  Statements denigrating defense counsel

9         Petitioner also argues that the prosecutor committed misconduct during his closing

10 argument by accusing defense counsel of coaching witnesses and denigrating defense counsel.

11 Petitioner asserts the following statements by the prosecutor during his closing argument and

12 rebuttal amounted to prosecutorial misconduct warranting federal habeas relief:

13              But [Nhai Moua] also testified that all of the alibi witnesses – all of
              the alibi witnesses went over to Jeff Silvia's office four or five
14             times and went over their testimony, what they were going to
              testify to on where they and the defendant were.  And they didn't
15             get separated.  They were being coached.  Let's get our stories
              straight.  Let's go in there, say all the same thing so everyone will
16             go there telling the truth.  Why is it so important that they had to do
              it four or five times? . . . .

17             We heard from a lot of defense witnesses, alibi witnesses.  We
18             heard from two last week, Mia and Nhai or Mai and Nhai, who
              said, yeah, we went over Jeff Silvia's office.  We went over the
19             testimony four or five times, like I had told you earlier.  I heard
              what each one was going to say four or five times.  They are
20             getting their story straight.  [¶]  Why is it so important to be
              coached to get the story straight?  Why did they need to do that?
21             Were they so worried about just coming in and telling the truth that
              the defendant was there for a short while perhaps and then left? . . .
22             .  It was odd that we have two witnesses testify last week they met
              four or five times and then Lou and Chang come in here and go,
23             "We were there four or five times.  We only went over the
              testimony one time with everyone there."  What happened over the
24             weekend?  Why did the story change?  Who talked to them? . . . . .

25             The witnesses yesterday were even calling Nhai and Mai – their
              testimony were lies if they said we testified four or five times at
26             Jeff Silvia's office, that's not true.  You heard them say

                                    28

that.  [¶]  The two alibi – the three alibi witnesses you heard from, their stories do not even jive.  Yet, some say the defendant was throwing up outside, some say throwing up inside.  The defendant, "I didn't throw up.  I didn't see any throw up."  They couldn't get their stories completely straight.  They were well coached.  They knew a question was asked to look over to the jury and look real nice, smile, make eye contact.  They were coached real well, but they still didn't get their stories straight . . . .

The defendant got up there coached.  He knew what to say.  He was answering questions before I asked him.  We caught him.  I hadn't asked a question, he knew what the question was I was going to ask and he would look over at you and smile, try to make eye contact with you.  He was coached.  He was coached pretty well.  But what he was saying was unbelievable. . . .

I never had any of the witnesses listen to the other's testimony before they came in here.  And there's a reason, so you don't sway someone's testimony by letting them hear another witness' testimony.  That's not what I did.  [¶]  The defense, he never even talked about that in his close.  He didn't even bring up his alibi witnesses.  The defendant has alibi witnesses here and the defense does not even mention them in their close.  And there is an obvious reason, that is, that they weren't believable.  [¶]  Their testimony was completely swayed.  They tried to get their stories straight, that's why the defense didn't even bring it up . . . .
Look at the witnesses the defense had come up here and lie to you.  They had opportunity four or five times to get their story straight and they still wouldn't do it.

(Reporter's Tr. at p. 944, 947, 948, 952-53, 988-89.)

Petitioner has not shown that the prosecutor's action with respect to denigrating defense counsel was so severe as to rise to the level of a due process violation.  As previously stated, the trial court reminded the jury that what the attorneys say is not evidence.  Before closing arguments, the trial court gave the jury the following admonition:  "[a]s I told you when we began, the attorneys are not witnesses.  They are not testifying under oath.  What they say is not evidence.  A closing argument, though, gives them an opportunity to argue the case to the jury.  [¶]  Now, because what they say is not evidence, you are not allowed to write anything down during closing arguments."  (Reporter's Tr. at p. 921.)  The trial judge instructed the jury that, "[y]ou must base your decision on the facts and the law."  (Id. at p. 996.)  He also instructed the jury that "[s]tatements made by the attorneys during trial are not evidence, however, if the

29

1  attorneys have stipulated or agreed to a fact, you must regard that fact as proven." (Id. at p. 997.)

2       In Furman v. Wood, 190 F.3d 1002, 1006 (9th Cir. 1999), the Ninth Circuit explained

3  that in determining whether the prosecutor's words amounted to prosecutorial misconduct,

4  whether the jury was instructed to decide the case solely on the basis of the evidence rather than

5  counsel's arguments is an important factor to consider.  Those instructions were given to the jury

6  in this case.  The jury is deemed to have understood and followed the court's instruction.  See

7  Weeks, 528 U.S. at 234 (citing Richardson v. Marsh, 481 U.S. 200, 211 (1987)).  Petitioner does

8  not present evidence to the contrary.  He is not entitled to federal habeas relief on this

9  prosecutorial misconduct argument.  Any purported misconduct would not be deemed to rise to

10  the level of a due process violation sufficient to warrant granting federal habeas relief under these

11  circumstances using the harmless error standard announced in Brecht.

12                  vi.  Statement "vouching" for a witness

13       Finally, Petitioner argues that the prosecutor improperly vouched for a witness.  Petitioner

14  asserts that the following statement by the prosecutor during his rebuttal closing amounted to

15  misconduct:  "[o]nly time Mercy has ever testified in this case under oath was when she came in

16  yesterday.  That's the first time.  It's the only time.  The only time that she could have perjured

17  herself.  She didn't.  She came in and told the truth."  (Reporter's Tr. at p. 994.)

18       It is improper for the prosecution to vouch for the credibility of a government witness.

19  United States v. Young, 470 U.S. 1, 18 (1985).  "Improper vouching typically occurs in two

20  situations:  (1) the prosecutor places the prestige of the government behind a witness by

21  expressing his or her personal belief in the veracity of the witness, or (2) the prosecutor indicates

22  that information not presented to the jury supports the witness's testimony."  United States v.

23  Brooks, 508 F.3d 1205, 1209 (9th Cir. 2007); see also United States v. Garcia-Guizar, 160 F.3d

24  511, 520 (9th Cir. 1998).  In evaluating a claim of prosecutorial misconduct, "a court should not

25  lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning

26  or that a jury, sitting through lengthy exhortation, will draw that meaning form the plethora of

30

1   less damaging interpretations." <u>King v. Schriro</u>, 537 F.3d 1062, 1070-71 (9th Cir. 2008).

2       The above statement by the prosecutor did not amount to improper vouching.  The

3   prosecutor's statement did not place the government's sanction on Mercy Heu's testimony nor

4   implied that information not in the evidence showed what the truth really was.  The prosecutor

5   did not imply that a credibility determination had been made by his office, the court or anyone

6   else.  He did not provide personal assurances of her veracity, suggest or refer to something not in

7   the record or invite the jurors to rely on the integrity of the government.

8       Even if the prosecutor's statement regarding Mercy Heu's testimony was improper, it did

9   not rise to the level of a due process violation sufficient to warrant granting federal habeas relief.

10  As noted with Petitioner's other prosecutorial misconduct arguments, the jury was specifically

11  instructed that their duty was to decide the case solely on the basis of the evidence received at

12  trial and any matter stipulated to by the attorneys.  They were also instructed that statements by

13  the attorneys were not evidence.  As the Ninth Circuit has noted, "[s]uch instructions dilute the

14  potential prejudice arising from improper comments." <u>United States v. Koon</u>, 34 F.3d 1416,

15  1445 (9th Cir. 1994), <u>rev'd on other grounds</u>, 518 U.S. 81 (1996); <u>see also</u> <u>United States v.</u>

16  <u>Necoechea</u>, 986 F.2d 1273, 1283 (9th Cir. 1993) ("Likewise, the vouching that occurred during

17  closing argument was effectively neutralized by the court's instruction that comments of counsel

18  are not evidence.").  For the foregoing reasons, the prosecutor's statements did not rise to the

19  level of improper vouching and/or did not render the trial fundamentally unfair to warrant

20  granting Petitioner federal habeas relief.  Petitioner has failed to show that he is entitled to

21  federal habeas relief on any of his arguments within Claim III.

22       D.    Claim IV

23       In Claim IV, Petitioner argues that trial counsel was ineffective for failing to object to the

24  purported prosecutorial misconduct alleged in Claims I-III.  The Sixth Amendment guarantees

25  effective assistance of counsel.  In <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), the Supreme

26  Court articulated the test for demonstrating ineffective assistance of counsel.  First, the petitioner

31

1    must show that considering all the circumstances, counsel's performance fell below an objective

2    standard of reasonableness.  See id. at 688.  Petitioner must identify the acts or omissions that are

3    alleged not to have been the result of reasonable professional judgment.  See id. at 690.  The

4    federal court then must determine whether in light of all the circumstances, the identified acts or

5    omissions were outside the wide range of professional competent assistance.  See id.

6         Second, a petitioner must affirmatively prove prejudice.  See id. at 693.  Prejudice is

7    found where "there is a reasonable probability that, but for counsel's unprofessional errors, the

8    result of the proceeding would have been different."  Id. at 694.  A reasonable probability is "a

9    probability sufficient to undermine the confidence in the outcome."  Id.  A reviewing court "need

10   not determine whether counsel's performance was deficient before examining the prejudice

11   suffered by defendant as a result of the alleged deficiencies . . . If it is easier to dispose of an

12   ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be

13   followed."  Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (citing Strickland, 466 U.S. at

14   697).

15        The Superior Court of California, County of San Joaquin provided the last reasoned

16   decision on the arguments within this Claim and stated the following:

17             As for trial counsel's failure to object, the Petitioner submits that
               during cross-examination, the prosecutor asked a series of
18             questions of defense alibi witnesses which, in essence, asked them
               if another witness testified differently, would that witness be lying.
19             Only three objections were made during the colloquy.  Two
               objections were made at a time when the prosecutor asked whether
20             the other witness was a liar.  Those objections were sustained.  The
               last objection was to a question asking whether another witness
21             told a lie.  The objection was sustained; the court explained the
               question called for a conclusion.  Thus, the contention in this
22             petition must be that Petitioner wanted trial counsel to object many
               more times during the line of questioning.
23
               It has often been noted by the courts that trial counsel may decide
24             not to object to evidence or an argument because an objection
               would highlight testimony or an argument and make it seem mroe
25             significant.  People v. Williams (1997) 16 C[al].4th 153, 214;
               People v. Felix (1994) C[al].A[pp].4th 1385, 1394-1395.
26

                                              32

"Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." . . . [M]ere failure to object to evidence or argument seldom establishes counsel's incompetence." People v. Felix (1994) 23 C[al].A[pp].4th 1385, 1394-1395.

The three defense witnesses whose testimony is at issue were Petitioner's three alibi witnesses. The jury was left with the decision to believe the prosecution's witnesses about Petitioner's whereabouts at the time of the shooting or the defense's witnesses. There is nothing to suggest that counsel's decision when to object and when not to object was anything but competent strategy. The same can be said for trial counsel's decision not to object to the prosecution's closing argument. Again, the specific concerns raised by Petitioner to the closing argument are the prosecutor's suggestion that the defense was a sham and the prosecutor's proclamation that a particular witness "told the truth." This is not enough to overcome the presumption of professional assistance and warrant habeas corpus relief.

(Resp't's Lodged Doc. 16 at p. 2-3.)

i. Ineffective Assistance with respect to Claim I

With respect to Petitioner's argument that counsel was ineffective for failing to object to the prosecutor's questions to witnesses regarding other witnesses veracity, Petitioner fails to satisfy the Strickland test to warrant federal habeas relief. First, contrary to Petitioner's argument that counsel failed to object to the prosecutor attempting to elicit from witnesses that other witnesses were lying as outlined in Claim I, trial counsel did object when the prosecutor asked Lou Vang and Chang Her whether Mai Vang was a liar. (See Reporter's Tr. at p. 786, 808-09, 811). The trial court sustained these objections by defense counsel. Counsel's performance could not be considered falling below an objectively standard of reasonableness when he in fact objected to the prosecutor's purported improper questioning of witnesses. As noted by the Superior Court, Petitioner's argument therefore must be based on the fact that his counsel did not object more to this testimony. However, as noted by the Superior Court, there is a strong presumption that counsel's conduct falls within the wide range of professional assistance. See

1    Strickland, 466 U.S at 689.  Petitioner failed to show that the state court's decision was an

2    unreasonable application of clearly established federal law.

3           Furthermore, even if counsel's conduct in failing to object more fell below an objective

4    standard of reasonableness, Petitioner still would not be entitled to federal habeas relief as he

5    failed to show to a reasonable probability that the outcome of the proceeding would have been

6    different had his counsel objected more times to the prosecutor's questions of the witnesses

7    outlined in Claim I.  For similar reasons as outlined in supra Part IV.A, Petitioner also fails to

8    show to a reasonable probability that the outcome of the proceeding would have been different

9    had his counsel objected to these questions.   The jury was specifically instructed that it was the

10   sole arbiter of the veracity of each witnesses' testimony and the jury is presumed to have

11   followed these instructions.  See Weeks,528 U.S. at 234.  Furthermore, as previously noted, at

12   least two witnesses testified that they saw Petitioner fire the gun on the night in question.  Thus,

13   Petitioner failed to establish the requisite Strickland prejudice.

14          Petitioner also argues that counsel was ineffective when he failed to object to the

15   prosecutor's statements during closing argument that, "[t]he witnesses yesterday were even

16   calling Nhai and Mai – their testimony were lies if they said we testified four or five times at Jeff

17   Silvia's office, that's not true.  You heard them say that."  (Id. at 948.)  Once again, Petitioner

18   fails to show that the state court's determination in denying this Claim under the first prong of

19   the Strickland test was an objectively unreasonable application of that test.  Defense counsel was

20   obviously aware that the jury would be instructed that counsel's statements were not evidence,

21   and objecting at this time would have only called attention to the issue of Petitioner's alibi

22   witnesses veracity or lack thereof.

23          Furthermore, even if Petitioner could satisfy the first prong of the Strickland test, he

24   failed to show to a reasonable probability that the outcome of the proceeding would have been

25   different had his counsel objected to the prosecutor's statements during his closing argument.  As

26   noted above, the trial judge specifically instructed the jurors that they were the sole judges of the

1  believability of a witness and the weight of the testimony to give to each witness.

2  (See Reporter's Tr. at p. 1001.)  The jury is presumed to have followed this instruction.  See

3  Weeks, 528 U.S. at 234.  Furthermore, there were at least two eyewitnesses to Petitioner's

4  purported crimes on the night in question which obviously called into doubt Petitioner's

5  purported alibi witnesses.  Thus, Petitioner is not entitled to federal habeas relief on his

6  ineffective assistance of counsel claim that his defense counsel failed to object to the purported

7  prosecutorial misconduct in Claim I.

8              ii.  Ineffective Assistance with respect to Claim II

9        Next, Petitioner argues that counsel was ineffective for failing to object to the

10  prosecution's improper introduction of inadmissible evidence.  The purported improper evidence

11  admitted arose during the testimony of Mercy Heu and was previously described in supra Part

12  IV.B.  Unlike Petitioner's other ineffective assistance of counsel arguments within Claim IV, it

13  does not appear as if there is a reasoned decision from the California state courts on this

14  ineffective assistance of counsel claim.  However, as previously noted, both the California Court

15  of Appeal and the California Supreme Court issued summary denials on Petitioner's state habeas

16  petitions.  Both of those petitions included a claim that trial counsel was ineffective for failing to

17  object to the prosecutor's questions regarding the evidence outlined in Claim II.  As recently

18  stated by the United States Supreme Court, a summary denial is determined to be a decision on

19  the merits.  See Harrington v. Richter, 131 S.Ct. 770, 784 (2011).  Thus, the record will be

20  independently reviewed with respect to this argument to determine whether the state court was

21  objectively unreasonable in its application of clearly established federal law.  See Musladin, 555

22  F.3d at 835.

23        Contrary to Petitioner's argument, counsel did object to the introduction of this evidence

24  at trial.  He moved for a mistrial based on prosecutorial misconduct arising from the prosecutor

25  continuing to ask questions about the tape even after the trial judge sustained defense counsel's

26  hearsay objection.  Ultimately, the trial court issued a curative instruction both immediately after

35

1   the testimony and during its final instructions to the jury before they began to deliberate.  Thus,

2   Petitioner's argument that counsel was ineffective for failing to object to the admission of this

3   evidence is directly contradicted by the record and counsel actions cannot be said to have fallen

4   below an objective standard of reasonableness.  Petitioner is not entitled to federal habeas relief

5   on his argument that defense counsel failed to object to the purported prosecutorial misconduct

6   outlined in Claim II.

7                   iii.  Ineffective Assistance with respect to Claim III

8           Petitioner also asserts that defense counsel should have made objections to the numerous

9   allegations of prosecutorial misconduct Petitioner alleged occurred during the prosecutor's

10  closing argument and rebuttal as outlined in Claim III.  Even if Petitioner could show that his

11  counsel should have objected to the points outlined in Claim III during the prosecutor's closing

12  argument, he failed to show that he was prejudiced under the Strickland standard.  As described

13  in supra Part IV.C, the trial judge gave the jury specific instructions that alleviated the chance of

14  any due process violation due to the prosecutor's statements during closing argument.  The jury

15  is presumed to have followed these instructions.  To the extent that any of the prosecutor's

16  statements during closing argument as alleged in Claim III were improper, the trial court's jury

17  instruction's alleviated any possible prejudice towards Petitioner.  Additionally, as previously

18  stated, at least two eyewitnesses testified that they saw Petitioner fire the weapon.  Petitioner

19  failed to show to a reasonable probability that the outcome of the proceeding would have been

20  different had defense counsel made the various objections during closing argument that

21  Petitioner argues amounts to ineffective assistance.  Thus, Petitioner failed to satisfy the

22  Strickland prejudice prong.

23          For the foregoing reasons, Petitioner is not entitled to federal habeas relief on any of his

24  ineffective assistance of trial counsel claims as stated within Claim IV.

25          E.  Claim V

26          In Claim V, Petitioner argues that the cumulative effect of Claims I-IV rendered

36

1    Petitioner's trial fundamentally unfair and denied him due process.  The combined effect of

2    multiple trial errors may give rise to a due process violation if the trial was rendered

3    fundamentally unfair, even where each error considered individually would not require reversal.

4    See Parle v. Runnels, 505 F.3d 922, 927 (9th Cir. 2007).  The fundamental question in

5    determining whether the combined effect of trial errors violated a defendant's due process rights

6    is whether the errors rendered the criminal defense "far less persuasive" see Chambers v.

7    Mississippi, 410 U.S. 284, 294 (1973), thereby having a "substantial and injurious effect or

8    influence" on the jury's verdict.  See Parle, 505 F.3d at 927 (quoting Brecht, 507 U.S. at 637).

9    Cumulative error is more likely to be found prejudicial when the government's case is weak.

10   See United States v. Frederick, 78 F.3d 1370, 1381 (9th Cir. 1996).

11            In this case, the evidence against Petitioner included eyewitness testimony.  The

12   testimony included at least two witnesses (Kukav Thao and Chuck Thao) who testified that they

13   saw Petitioner hanging out of the black truck and firing the shots.  (See Reporter's Tr. at p. 60,

14   562.)  Additionally, the trial court gave jury instructions and curative instructions made any

15   impropriety by the prosecutor not create a substantial and injurious effect or influence on the

16   jury's verdict.  Petitioner cannot establish that the cumulative effect of the prosecutor's purported

17   misconduct and trial counsel's purported ineffectiveness rendered his trial fundamentally unfair

18   or the defense far less persuasive.  The record reflects that the cumulative effect of the purported

19   errors as stated in Claims I-IV did not result in Petitioner receiving an unfair trial.  Therefore,

20   Petitioner is not entitled to federal habeas relief on Claim V.

21            F.    Claim VI

22            In Claim VI, Petitioner alleges that appellate counsel was ineffective for failing to raise

23   Claim II on appeal based on federal constitutional law as well as state law.  A claim of

24   ineffective assistance of appellate counsel uses the same Strickland standard that is applied to

25   trial counsel.  See Smith v. Robbins, 528 U.S. 259, 285 (2000).  Contrary to Petitioner's

26   assertions in his petition, appellate counsel argued that the prosecutor committed misconduct

with respect to the issues raised in Claim II of this federal habeas petition under both state and

federal law.  For example, on direct appeal, Petitioner's appellate counsel stated the following:

> The definitive statement on the limitations of prosecutorial conduct emerges from the case of <u>Berger v. United States</u> (1935) 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314:
>
>> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.  As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer.  He may prosecute with earnestness and vigor – indeed, he should do so.  But while he may strike hard blows, he is not at liberty to strike foul ones.  It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to sue every legitimate means to bring about a just one.

(Resp't's Answer, Lodged Doc. 1 at p. 30.)  Thus, appellate counsel did not only rely on state law

in arguing that the prosecutor committed misconduct with respect to Claim II.  Additionally, the

California Court of Appeal cited to both California law and the Federal Constitution in denying

Claim II.  (<u>See</u> Slip Op. at p. 15 ("A prosecutor's conduct violates the federal Constitution when

it forms a pattern of conduct so egregious that it taints the trial with such unfairness as to make

the conviction and denial of due process.").)  Therefore, Petitioner is not entitled to federal

habeas relief on Claim VI.

       G.     Claims VII & VIII

     In Claim VII, Petitioner argues that the prosecutor improperly dismissed four potential

jurors because of their Asian race.  Petitioner relies on <u>Batson</u>, 476 U.S. 79, to support Claim

VII.  In Claim VIII, Petitioner argues that appellate counsel was ineffective for failing to raise the

<u>Batson</u> issue on appeal.

     The parties filed simultaneous supplemental <u>Batson</u> briefs on October 20, 2010.

Respondent made three arguments in his supplemental brief.  Respondent argued that the <u>Batson</u> claim was unexhausted and/or procedurally barred.  Alternatively, Respondent argued that Petitioner's <u>Batson</u> claim should be denied on the merits.  In Petitioner's supplemental <u>Batson</u> brief, he argued that the prosecutor improperly struck four potential jurors because of their Asian race.

On December 14, 2010, Petitioner filed a response to Respondent's supplemental <u>Batson</u> brief.  In that response, Petitioner opposed Respondent's procedural bar and lack of exhaustion arguments.  Before reaching the merits of the <u>Batson</u> issue, Respondent's procedural default and lack of exhaustion arguments will be analyzed.  Both arguments are rejected for the reasons described <u>infra</u>.

### i. Exhaustion/Procedural Default

"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the 'opportunity to pass upon and correct' alleged violations of prisoners' federal rights." <u>Baldwin v. Reese</u>, 541 U.S. 27, 29 (2004) (quoting <u>Duncan v. Henry</u>, 513 U.S. 364, 365 (1995) (per curiam)).  "The state courts have been given a sufficient opportunity to hear an issue when the petitioner has presented the state court with the issue's factual and legal basis." <u>Weaver v. Thompson</u>, 197 F.3d 359, 364 (9th Cir. 1999).  "A petitioner has satisfied the exhaustion requirement if:  (1) he has 'fairly presented' his federal claim to the highest state court with jurisdiction to consider it . . . or (2) he has demonstrated that no state remedy remains available." <u>Johnson v. Zenon</u>, 88 F.3d 828, 829 (9th Cir. 1996).

Regardless of whether the claim was raised on direct appeal or in a post-conviction proceeding, the exhaustion doctrine requires that each claim be fairly presented to the state's highest court.  <u>See id.</u>  Although the exhaustion doctrine requires only the presentation of the federal claim to the highest court, the claims must be presented in a posture that is acceptable under state procedural rules.  <u>See</u> <u>Sweet v. Cupp</u>, 640 F.2d 233, 237-38 (9th Cir. 1981).  When a

1  procedural rule is independent of federal law and adequate to support the judgment, federal

2  review of the claim is barred unless the petitioner can demonstrate either cause for the procedural

3  default and actual prejudice resulting from the alleged constitutional violation or that the failure

4  to consider the claim will result in a fundamental miscarriage of justice.  See Carter v. Giurbino,

5  385 F.3d 1194, 1196-97 (9th Cir. 2004).

6       Respondent first argues that Petitioner's Batson claim is unexhausted and/or procedural

7  defaulted.  As the Ninth Circuit has explained:

> Procedural default and failure to exhaust are different concepts, see
> Franklin v. Johnson, 290 F.3d 1223, 1230 (9th Cir. 2002) . . . Both
> are reasons a federal court may be required to refuse to hear a
> habeas claim brought by a defendant convicted in state court.  The
> practical difference between the two is that when a defendant
> merely fails to exhaust, he may still be able to return to state court
> to present his claims there.  When a defendant's claim is
> procedurally defaulted, either the state court was presented with the
> claim but decline to reach the issue for procedural reasons, or it is
> clear that the state court would hold the claim procedurally barred.

14  Sandgathe v. Maass, 314 F.3d 371, 376 (9th Cir. 2002).

15       Petitioner raised his Batson claim to all three levels of the California state courts in his

16  state habeas petitions.  The Superior Court of California, County of San Joaquin was the only

17  court to issue a reasoned decision on this Claim and stated the following in denying Petitioner's

18  Batson claim:

> According to Petitioner, the prosecution used its peremptory
> challenges for the purpose of systematically excluding all Asian
> jurors – to Petitioner's prejudice.  Petitioner is Asian.  Petitioner
> asserts that defense counsel objected to the prosecution's tactic and
> a hearing was held.  Ultimately, the trial court overruled the
> objection.
>
> Petitioner concedes he advised his appellate counsel to raise this
> issue on appeal, but appellate counsel did not.  Habeas corpus
> relief is not a substitute for appeal.  In re Dixon (1953) 41 C[al].2d
> 756, 662.

25  (Resp't's Lodged Doc. Ex. 16 at p. 2.)  Petitioner's argument is really one of procedural default

26  as opposed to lack of exhaustion.  Petitioner raised the Batson claim to each level of the

1   California state courts which rejected the Batson argument based on a procedural finding,

2   specifically Petitioner's failure to raise the issue on direct appeal.

3        Petitioner argues that Respondent's affirmative defense of procedural default should be

4   barred because Respondent failed to raise it in his answer.  In his answer, Respondent did not

5   raise the issue that Claim VII was procedurally defaulted and expressly waived any exhaustion

6   argument by admitting that Petitioner's claims were exhausted.  (See Resp't's Answer at p. 2

7   ("Respondent admits that Petitioner has exhausted his state remedies on the claims raised in this

8   petition.").)

9        As previously noted, Respondent first raised the issue of procedural default/exhaustion in

10  his Batson brief that was ordered by Judge Newman.  However, this supplemental brief was not

11  the proper forum to raise this issue.  As the Ninth Circuit explained in Morrison, 399 F.3d at

12  1046, "procedural default, like the statute of limitations, is an affirmative defense.  We therefore .

13  . . hold that the defense of procedural default should be raised in the first responsive pleading in

14  order to avoid waiver."  Federal Rule of Civil Procedure "7(a) defines 'pleadings' as a complaint

15  and answer; a reply to a counterclaim; an answer to a cross-claim; and a third-party complaint

16  and answer.  Anything else is a motion or paper.  The requirement in Rule 8(c) that a party set

17  forth the affirmative defenses listed in that rule applies only to responsive 'pleadings,' not to

18  motions."  Id.

19       At no time has Respondent ever sought to amend his answer to include a procedural

20  default argument.  The court-ordered Batson brief (filed over four years after the answer), and

21  filed simultaneously with Petitioner's supplemental Batson brief, must be considered a "paper,"

22  which is insufficient to raise the affirmative defense not raised in the answer.  Under these

23  circumstances, Respondent's procedural default argument is waived.  See Hyde v. Moore, Civ.

24  No. 09-3240, 2011 WL 489723, at *4 (E.D. Cal. Feb. 7, 2011) ("Respondent has waived the

25  affirmative defense of procedural default by failing to raise it in the answer."); Carter v. Scribner,

26  Civ. No. 04-272, 2009 WL 4163542, at *6 (E.D. Cal. Nov. 23, 2009) ("Respondent did not

41

1  expressly raise Petitioner's state procedural default in its answer and thus waived the affirmative

2  defense of a procedural bar."), aff'd by, No. 09-17869, 2011 WL 219525 (9th Cir. Jan. 24, 2011).

3      Even if Respondent's procedural default argument on the Batson claim is not waived, two

4  other reasons dictate why Respondent's procedural default argument must fail.  First, Petitioner

5  argues that appellate counsel's ineffectiveness in failing to raise the Batson issue on appeal

6  constituted the requisite "cause" and "prejudice" to overcome any purported procedural default

7  of his Batson argument.  A procedural defaulted claim can be reviewed by a federal court if the

8  petitioner can show:  (1) cause for the default and actual prejudice as a result of the alleged

9  violation of federal law; or (2) that failure to consider the claims will result in a fundamental

10  miscarriage of justice.  See Coleman v. Thompson, 501 U.S. 722, 750 (1991).  "Cause" to excuse

11  default exists if the petitioner "can show that some objective factor external to the defense

12  impeded his efforts to comply with the State's procedural rule."  Murray v. Carrier, 477 U.S. 478,

13  488 (1986).  Ineffective assistance of counsel may be cause to excuse default only if the

14  procedural default was the result of an independent constitutional violation.  See Edwards v.

15  Carpenter, 529 U.S. 446, 451 (2000) ("Not just any deficiency in counsel's performance will do,

16  however; the assistance must have been so ineffective as to violate the Federal Constitution.").

17  Thus, "[s]o long as a defendant is represented by counsel whose performance is constitutionally

18  ineffective under the standard established in Strickland v. Washington, [the federal courts]

19  discern no inequity in requiring him to bear the risk of attorney error that results in procedural

20  default."  Murray, 477 U.S. at 488.

21      For the reasons described infra, Petitioner's appellate counsel's performance fell below

22  an objective standard of reasonableness.  Therefore, the underlying merits of the Batson issue

23  would have to be analyzed to determine whether Petitioner has shown to a reasonable probability

24  that his Batson claim would have been successful on appeal.

25      Finally, a third reason beyond waiver and the cause and prejudice issues requires an

26  analysis of the merits of Petitioner's Batson claim under these circumstances.  Petitioner does not

1  only raise his ineffective assistance of appellate counsel claim for failing to raise the <u>Batson</u> issue

2  as the "cause" and "prejudice" to overcome any purported procedural default of Claim VII.

3  Instead, he also raises it as its own stand alone separate claim.

4        In <u>Eagle v. Linahan</u>, 279 F.3d 926, 938 (11th Cir. 2001), the Eleventh Circuit noted the

5  following:

6              In both his state and federal petitions, Eagle's <u>Batson</u> claim has
               necessarily been a rider on his ineffective assistance of appellate
7              counsel claim because he procedurally defaulted the <u>Batson</u> claim
               by not raising it on direct appeal.  Were he so inclined, Eagle could
8              bring his <u>Batson</u> claim as a substantive claim and seek to overcome
               the procedural default by alleging that his appellate counsel's
9              ineffectiveness satisfied the <u>Wainwright</u> cause and prejudice test.
               However, by asserting ineffective assistance of appellate counsel as
10             the substantive claim and relying on counsel's failure to raise the
               <u>Batson</u> claim as the evidence of her ineffectiveness, Eagle has
11             avoided the need to justify his procedural default of the <u>Batson</u>
               claim.

12

13 Petitioner's case is somewhat similar to <u>Eagle</u> in that he raised a stand alone ineffective

14 assistance of appellate counsel claim for failing to raise the <u>Batson</u> issue on direct appeal.  In

15 <u>Eagle</u>, the Eleventh Circuit analyzed the merits of the ineffective assistance of counsel claim for

16 failing to raise a <u>Batson</u> claim on direct appeal.  It ultimately held that the petitioner was denied

17 effective assistance of counsel on appeal and that his <u>Batson</u> claim would have succeeded on

18 appeal.  <u>See id.</u> at 943.  Thus, <u>Eagle</u> provides further support for bypassing Respondent's

19 procedural default argument because Petitioner raises a separate ineffective assistance of

20 appellate counsel for failing to raise the <u>Batson</u> claim on direct appeal in Claim VIII.  For the

21 foregoing reasons, the merits of Petitioner's <u>Batson</u> argument has to be analyzed whether it be for

22 Claim VIII or Claim VII.

23        ii.  <u>Pinholster</u>

24        Before reaching the merits of Petitioner's remaining issues, the recent United States

25 Supreme Court decision in <u>Pinholster</u>, 131 S.Ct. 1388, must be analyzed to determine what

26 effect, if any, its ruling has on this case in light of the fact that the evidentiary hearing in this case

43

1    was held before the Supreme Court issued <u>Pinholster</u>.

2       After <u>Pinholster</u> was issued, the parties were ordered to file supplemental briefs analyzing

3    any impact it has on this case. Respondent argues that <u>Pinholster</u> stands for the proposition that

4    Petitioner is not entitled to expand the record with evidence from the evidentiary hearing. In

5    support of his position, Respondent argues that "claims 7 and 8 were both adjudicated, and

6    rejected, on the merits by the state court. Because Petitioner's claims are subject to review under

7    § 2254(d)(1) and (2), this Court is precluded from considering any evidence on federal habeas

8    that Petitioner did not present to the state court." (Resp't's <u>Pinholster</u> Br. at p. 1.) Petitioner

9    responds that <u>Pinholster</u> does not apply to the instant case and that the evidence admitted at the

10    March 16, 2011 can be considered in analyzing Petitioner's Claims. For the following reasons,

11    Petitioner is correct.

12       In <u>Pinholster</u>, the Supreme Court held that for habeas claims that have been decided on

13    their merits in state court, a federal court's review under Section 2254(d)(1) – whether the state

14    court determination was contrary to or an unreasonable application of clearly established federal

15    law – must be confined to the record that was before the state court. <u>See</u> 131 S.Ct. at 1398.

16    More specifically, the Supreme Court stated that "evidence introduced in a federal court has no

17    bearing on § 2254(d)(1) review" and that "evidence later introduced in federal court is irrelevant

18    to § 2254(d)(1) review."[4] <u>Id.</u> at 1400. Thus, before utilizing any of the evidence from the March

19    16, 2011 hearing, the record before the state court must be reviewed in analyzing Claim VIII.

20       Petitioner was extremely diligent in seeking a copy of the voir dire transcript at each level

21    of the California state courts so that he could fully apprise the state court's of his <u>Batson</u> claim.

22    The voir dire transcript not only impacted the <u>Batson</u> claim but also impacted Petitioner's

23    ineffective assistance of appellate counsel claim for failing to raise the <u>Batson</u> claim on appeal as

24    the merits of the <u>Batson</u> claim would be necessary for Petitioner to satisfy <u>Strickland</u> prejudice.

25

26        [4] The Supreme Court also stated that Section 2254(d)(2) precluded federally developed evidence. <u>See</u> <u>Pinholster</u>, 131 S.Ct. at 1400 n.7.

1      In <u>Boyd v. Newland</u>, 467 F.3d 1139, 1150 (9th Cir. 2006), the Ninth Circuit explained

2 that "the state court's refusal to provide Petitioner with the whole voir dire transcript, in the face

3 of a plausible <u>Batson</u> claim, involved an unreasonable application of clearly established Supreme

4 Court precedent."  The same can be said in this case.  Petitioner presented a plausible <u>Batson</u>

5 claim (and therefore a plausible ineffective assistance of appellate counsel claim for failing to

6 raise the <u>Batson</u> issue on direct appeal) in his state habeas petitions.  In his state habeas petitions,

7 Petitioner argued the following:

8         Many of the prospective jurors were of Asian descent.  During voir
        dire, four of the numerous Asians were questioned for the purpose

9         of being impaneled.  Despite their availability and otherwise
        apparent suitability, the prosecutor used peremptory challenges to

10         cause their dismissal.  (CT 200-201, 212-13.)  Defense counsel
        objected to the prosecutor's use of peremptory challenges to

11         exclude all Asians from the jury and a hearing was held.  One of
        the reasons given by the prosecutor was that one of the prospective

12         Asian jurors appeared to have smiled in the direction of the defense
        table.  While this is the only example of the prosecutor's

13         explanations petitioner can recall with specificity, petitioner
        affirmatively states that all of the prosecutor's reasons were equally

14         suspect.  The trial court overruled the objection and a jury was
        selected.  There were no Asians on the jury or among the

15         alternates.  Petitioner is Asian.

16 (Resp't's Lodged Doc. 15 at p. 36.)  Petitioner continued in his state habeas petition by

17 requesting a copy of the voir dire transcript so that his <u>Batson</u> claim could be fully and fairly

18 adjudicated.  (<u>See id.</u> at p. 37.)  Petitioner presented a plausible <u>Batson</u> issue to the state courts

19 and requested the voir dire transcript which was necessary if Petitioner was ever going to prove

20 his stand alone <u>Batson</u> claim as well as his ineffective assistance of appellate counsel claim for

21 failing to raise the <u>Batson</u> issue on direct appeal.

22      Under these circumstances, the state court's rejection of Petitioner's request and its

23 corresponding opinion constituted an unreasonable application of clearly established Supreme

24 Court precedent.  For example, the state court denied Claim VIII on the merits due to Petitioner's

25 "vague" and "ccnclusory" allegations of the <u>Batson</u> issue.  Of course Petitioner's claim could

26 only be vague as the court had previously denied Petitioner's request for the voir dire transcript,

1  something which he was entitled to receive as stated in <u>Boyd</u>.  Petitioner was improperly stopped

2  by the state court's from making a more detailed argument on his <u>Batson</u> argument by the courts'

3  failure to grant his request for the voir dire transcript.  The state court's decision did not meet the

4  criteria set forth in § 2254(d)(1) making <u>Pinholster</u> inapplicable.  Even though the state court's

5  decision failed to meet the § 2254(d)(1) criteria, a reviewing court must conduct a de novo

6  review of the applicable habeas claim.  See <u>Frantz</u>, 533 F.3d at 735.

7             iii.  Objective Unreasonableness of Petitioner's Appellate Counsel

8        A standard record on appeal in the California state courts includes the reporter's transcript

9  of the oral proceedings at trial, but does not necessarily include "the voir dire examination of

10  jurors and any opening statements."  Cal. Rules of Court, Rule 8.320(c)(3).  A party, however,

11  may move to augment the record to include matters outside the normal record.  <u>See</u> <u>id.</u> at Rule

12  8.155.  To justify augmentation, the party must signify with some certainty "how materials not

13  included in the normal transcript may be useful to him on appeal."  <u>People v. Hill</u>, 67 Cal.2d 105,

14  124, 60 Cal. Rptr. 234, 429 P.2d 586 (1967).

15        In this case the voir dire transcript was not included in the record on appeal nor does the

16  Clerk's Transcript indicate that a <u>Batson</u> type motion was made during the voir dire proceedings.

17  However, Petitioner put Ms. Hart on notice about a possible <u>Batson</u> claim in two separate letters.

18  In a letter dated August 14, 2002, well before Petitioner's appellate counsel filed her opening

19  brief on appeal, Petitioner indicated to Ms. Hart the issue of "no minority jury" and explained to

20  her that "Defendant didn't have any members from minority communities.  The prosecutor

21  alleged use of peremptory challenge to strike Asians and Hispanics from the jurys [sic] on the

22  ground of group bias alone in violation of <u>People v. Wheeler</u>, <u>supra</u>, 22 Cal.3d 258, 148 Cal.

23  Rptr. 890, 583 P.2d 748."  (Hr'g Mar. 16, 2011 Pet'r's Ex. 1.)  Petitioner sent Ms. Hart another

24  letter dated April 27, 2003 which stated the following, "How about the part that I didn't have any

25  members from minority communities.  The prosecutor alleged use of peremptory challenges to

26  strikes Asians and Hispanics from the jury on the ground of group bias alone."  (<u>Id.</u> Ex. 2.)

1        In this case, Petitioner's appellate counsel was at a minimum put on notice by her client

2   that there might be a possible <u>Batson</u> issue.  Yet, she failed even to request a copy of the voir dire

3   transcript that was not part of the record on appeal.  During the March 16, 2011 evidentiary

4   hearing, Ms. Hart testified as follows:

5               I believe I simply overlooked Mr. Pao Lo's letter which does
              certainly inform me of a potential Batson/Wheeler issue . . . . And,
6               of course, you know, I look at what the client writes to me.
              Obviously I overlooked it in this case . . . . Certainly there is this
7               letter from the client alerting me to the issue . . . . So I think what
              happened here, Counsel, is that I overlooked the client's letter
8               which came before I received the transcripts, and then I went and
              looked at the transcripts and formulated what I thought were the
9               significant issues and did not request the jury voir dire transcript,
              which if I had received it would have alerted me to the
10              Batson/Wheeler issue.

11  (Hr'g Tr. Mar. 16, 2011 at p. 22-23.)  Later on during her testimony, Ms. Hart testified that had

12  she known there was a <u>Batson</u> issue present in the reporter's transcript of the voir dire, she would

13  have likely raised it in Petitioner's appeal.  (<u>See</u> <u>id.</u> at p. 26.)

14       Petitioner's appellate counsel's performance fell below an objective standard of

15  reasonableness.  In <u>Strickland</u>, 466 U.S. at 690-91, the Supreme Court explained that "strategic

16  choices made after thorough investigation of law and facts relevant to plausible options are

17  virtually unchallengeable; and strategic choices made after less than complete investigation are

18  reasonable precisely to the extent that reasonable professional judgments support the limitations

19  on investigation.  In other words, counsel has a duty to make reasonable investigation or to make

20  a reasonable decision that makes particular investigations unnecessary."  Not having represented

21  Petitioner at trial, Ms. Hart had no reliable way of finding out whether Petitioner had a

22  meritorious <u>Batson</u> claim other than reviewing the voir dire transcript (or at a minimum speaking

23  to trial counsel).  <u>See</u> <u>e.g.</u>, <u>Hardy v. United States</u>, 375 U.S. 277, 279-80 (1964) (stating that

24  appellate counsel who did not represent defendant at trial cannot discharge his obligations as

25  counsel without reviewing the trial transcripts).  Ms. Hart did neither.  As Justice Goldberg noted

26  in his concurring opinion in <u>Hardy</u>:

47

1         As any effective appellate advocate will attest, the most basic and
        fundamental tool of his profession is the complete trial transcript,
2         through which his trained fingers may leaf and his trained eyes may
        roam in search of an error, a lead to an error, or even a basis upon
3         which to urge a change in an established and hitherto accepted
        principle of law.  Anything short of a complete transcript is
4         incompatible with effective appellate advocacy.

5 Id. at 288 (Goldberg, J., concurring) (footnote omitted).

6      In this case, it was unreasonable for Ms. Hart to proceed with Petitioner's appeal without

7 conducting any investigation whatsoever into voir dire issues after being so apprised by

8 Petitioner.  See Wiggins v. Smith, 539 U.S. 510, 521 (2003) (discussing counsel's duty to

9 investigate or make a reasonable determination that a certain investigation is unnecessary).

10 Petitioner's appellate counsel failed to follow up on this potential meritorious claim by

11 requesting a copy of the voir dire transcript for her review.  Even after being apprised of a

12 possible issue of the voir dire proceedings by Petitioner, appellate counsel failed to even make a

13 reasonable inquiry on the Batson issue by failing to contact Petitioner's trial counsel.  (See Hr'g

14 Tr. Mar. 16, 2011 at p. 36-37.)  Under these specific circumstances, her performance was

15 objectively unreasonable as she failed to conduct a proper investigation into Petitioner's claim

16 and failed to make a reasonable determination that investigation into this claim was unnecessary.

17

18                 iv.  Strickland Prejudice

19      Even though Petitioner has satisfied the first prong of the Strickland test, he still must

20 show to a reasonable probability that the outcome of the proceeding would have been different

21 had appellate counsel raised the Batson issue on direct appeal.

22      Petitioner asserts that the prosecutor improperly struck four potential jurors because they

23 were Asian; specifically Charlie Foo, Patricia Lee, Anita Deruosi and Violeta Egholm.  To

24 establish a Batson claim, the defendant must first make a prima facie showing that a challenge

25 was made on an impermissible basis, such as race.  476 U.S. at 96; see also Johnson v.

26 California, 545 U.S. 162, 170-71 (2005).  To establish a prima facie case, a petitioner must show

that (1) the prospective juror is a member of a cognizable racial group, (2) the prosecutor used a

peremptory strike to remove the juror, and (3) the totality of the circumstances raises an inference

that the strike was motivated by race.  See Boyd, 467 F.3d at 1143 (citing Batson, 476 U.S. at

96).  Where the defendant has made a prima facie showing of discrimination, the burden shifts

to the prosecutor to offer a race-neutral reason for the challenge that relates to the case.  See id. at

168.  Where the prosecutor offers a race-neutral explanation for the challenge, the trial court

decides whether the defendant has proved the prosecutor's motive for the challenge was

purposeful racial discrimination.  See id.; see also Batson, 476 U.S. at 98.  The opponent of the

strike has the ultimate burden of persuasion regarding racial motivation.  See Purkett v. Elem,

514 U.S. 765, 768 (1995) (per curiam).  An en banc panel of the Ninth Circuit in Kesser v.

Cambra, 465 F.3d 351, 359-60 (9th Cir. 2006) (en banc) discussed at length the requirements of a

court in analyzing the third step of a Batson claim:

> At this stage, "the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination."  Purkett, 514 U.S. at 768.  Although the burden remains with the defendant to show purposeful discrimination, the third step of Batson primarily involves the trier of fact.  After the prosecution puts forward a race-neutral reason, the court is required to evaluate "the persuasiveness of the justification."  Id. To accept a prosecutor's stated nonracial reasons, the court need not agree with them.  The question is not whether the stated reason represents a sound strategic judgment, but "whether counsel's race-neutral explanation for a peremptory challenge should be believed."  Hernandez v. New York, 500 U.S. 352, 365 (1991) (plurality opinion).  "It is true that peremptories are often the subjects of instinct," and that "it can sometimes be hard to say what the reason is."  Miller-El [v. Dretke], [545 U.S. 231], 125 S.Ct. at 2332 [(2005)].  "But when illegitimate grounds like race are in issue, a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives."  Id.  "While subjective factors may play a legitimate role in the exercise of challenges, reliance on such factors alone cannot overcome strong objective indicia of discrimination. . . ."  Burks v. Borg, 27 F.3d 1424, 1429 (9th Cir. 1994).
>
> The trier of fact may not turn a blind eye to purposeful discrimination obscured by race-neutral excuses.  "[T]he prosecutor must give a 'clear and reasonably specific' explanation of his 'legitimate reasons' for exercising the challenges."  Batson,

476 U.S. at 98 n. 20 (quoting <u>Tex. Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 258 (1981)).  "A <u>Batson</u> challenge does not call for a mere exercise in thinking up any rational basis."  <u>Miller-El</u>, 125 S.Ct. at 2332.  Reasons must be "related to the particular case to be tried."  <u>Batson</u>, 476 U.S. at 98.  "[I]mplausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination."  <u>Purkett</u>, 514 U.S at 768.

The court need not accept any proffered rationale.  We have recognized that "[w]hen there is reason to believe that there is a racial motivation for the challenge, neither the trial courts nor we are bound to accept at face value a list of neutral reasons that are either unsupported in the record or refuted by it."  <u>Johnson</u>, 3 F.3d at 1331.  The court must evaluate the record and consider each explanation within the context of the trial as a whole because "'[a]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts.'"  <u>Hernandez</u>, 500 U.S at 363, 111 S.Ct. 1859 (quoting <u>Washington v. Davis</u>, 426 U.S. 229, 242 (1976)); <u>see also</u> <u>Miller-El</u>, 125 S.Ct. at 2324 (noting that <u>Batson</u> requires inquiry into "'the totality of the relevant facts' about a prosecutor's conduct" (quoting <u>Batson</u>, 476 U.S. at 94, 106 S.Ct. 1712)); <u>Batson</u>, 476 U.S. at 93, 106 S.Ct. 1712 ("In deciding if the defendant has carried his burden of persuasion, a court must undertake a sensitive inquiry into such circumstantial and direct evidence as may be available." (internal quotation marks omitted)).  A court need not find all nonracial reasons pretextual in order to find racial discrimination.  "[I]f a review of the record undermines the prosecutor's stated reasons, or many of the proffered reasons, the reasons may be deemed a pretext for racial discrimination."  <u>Lewis v. Lewis</u>, 321 F.3d 824, 830 (9th Cir. 2003); <u>see also</u> <u>United States v. Chinchilla</u>, 874 F.2d 695, 699 (9th Cir. 1989) ("Thus, the court is left with only two acceptable bases for the challenges. . . . Although these criteria would normally be adequately 'neutral' explanations taken at face value, the fact that two of the four proffered reasons do not hold up under judicial scrutiny militates against their sufficiency.").

<u>See also</u> <u>Green v. LaMarque</u>, 532 F.3d 1028, 1030 (9th Cir. 2008) (discussing the court's inquiry

at the third step of a <u>Batson</u> analysis).  "'If a prosecutor's proffered reason for striking a

[minority] panelist applies just as well to an otherwise - similar [nonminority] who is permitted

to serve, that is evidence tending to prove purposeful discrimination to be considered at <u>Batson's</u>

third step.'"  <u>Kesser</u>, 465 F.3d at 360 (quoting <u>Miller-El</u>, 125 S.Ct. at 2325).

Each potential juror in this case had to orally answer a series of seven introductory

questions that were posed to them by the trial court on a board in front of them.  The potential

50

jurors were each asked the following questions:

> And the first question is your name . . . Then the city you live in, your occupation, if you are employed.  If you are retired, please tell us your previous occupation.
>
> Number two, your spouse's occupation, if you have a spouse.  Adult children's occupation, if you have adult children.
>
> Number three, do you know any of the attorneys or staff in the district attorney's office or public defender's office . . . .
>
> Number four, do you know any of the witnesses or parties in this case [whereupon the trial court listed the parties and the potential witnesses] . . . .
>
> Number five, have you ever heard about this case?
>
> Number six, have you ever served as a juror before in any type of case?  If you have served as a juror, I'll ask you if it was a civil case or a criminal case.  Also, whether or not the jury reached a verdict.  If it did reach a verdict, please don't tell me what the verdict was, just whether or not it reached a verdict.
>
> And, then, number seven, and this is the most important question, this is why we are going through all of this:  Is there any reason why you can't be fair to both sides in this case?

(Resp't's Lodged Doc. 10 at p. 42-44.)  After these preliminary questions were answered by the potential jurors, the court asked specific questions to the potential jurors depending on their answers to the seven questions.  The attorneys for each side were also allowed to ask general questions to the jury pool as well as specific questions to specific jurors.

During the voir dire proceedings, Petitioner's trial counsel argued that the prosecutor was impermissibly striking jurors based on their Asian race.  Petitioner is Asian.  After each side used a round of peremptory strikes, new potential jurors were filled in to replace those that had been struck.[5]  Mr. Foo and Ms. Egholm were from the first pool of potential jurors who were questioned by the attorneys.  (See Resp't's Lodged Doc. 10 at p. 46, 48.)  Mr. Foo was the second potential juror struck by the prosecutor and Ms. Egholm was the third potential juror

---

[5] Each side typically used three strikes in each round.  However, in the second round of peremptory strikes, the prosecutor used four strikes and the defense used three strikes.

1  struck by the prosecutor.  (See id. at p. 117.)

2      After the parties each struck three potential jurors, several new potential jurors were

3  brought in and questioned by the attorneys.  Mrs. Deruosi was among this second group of

4  potential jurors that was brought in.  (See id. at p. 117-18.)  She was the sixth potential juror

5  struck by the prosecutor.  (See id. at p. 150.)

6      After the second round of peremptory strikes, another group of potential jurors was

7  brought in for questioning.  Among this third group of potential jurors was Ms. Lee.  (See id. at

8  p. 151.)  In the third round of peremptory strikes, the prosecutor did not strike Ms. Lee.

9      After the third round of peremptory strikes, a fourth group of potential jurors was brought

10  in for questioning.  (See id. at p. 172.)  Ms. Lee was struck in the fourth round by the prosecutor.

11  (See id. at p. 192.)

12      The following colloquy took place during the voir dire proceedings after Petitioner's

13  defense counsel argued against the purported impermissible strikes used by the prosecutor's

14  towards potential Asian jurors:

15          MR. SILVIA:  It's been my observation that the prosecutor has
           systematically exercised challenges with respect to the potential
16          jurors that appear to be of Asian descent and also other
           minorities.  [¶]  For instance, he's exercised a challenge with
17          respect to an individual by the name of Charlie Foo.  There was
           another potential juror by the name of Violeta Egholm, that those
18          two, according to my observations, were Asian.  [¶]  There was a
           Miss Lee that was most recently challenged, was exercised against,
19          who also appeared to me to be of Asian descent . . . . And so I
           think this systematic exclusion of Asians, particularly, and
20          minorities in general is in violation of the law addressed in the
           Wheeler case.
21          THE COURT:  I do find a prima facie case.  Mr. Rasmussen, what
           is your response as far as the reason for excusing those jurors.
22          MR. RASMUSSEN:  Well, I think they need to be addressed
           separately.  First, the Asians.  I believe one of the people was Mr.
23          Foo, who worked in human resources for San Joaquin County.  I
           noticed – and I even told Mr. Silvia yesterday, that he smiled at his
24          client during the break and I saw the defendant in this case, Pao Lo,
           smile back at Mr. Foo.  And, for that reason, and I thought that he
25          was young and lacked life experiences.  [¶]  I know Miss Lee – I'm
           not doing these in order – Miss Lee, I excused her.  I thought her
26          personality was very strong and I thought that that was a reason,

52

that I did not feel that she should be on this jury . . . .
Egholm.  She was one – as you can see, and I'll even reveal my notes if I can find them here.  I could not get her to respond to any of the questions.  All I knew about her was that she was from Manteca, assistant manager, her husband worked at the Depot and she has kids.  And I never got her to respond to another question and I did not feel that I knew her enough . . . .
MR. SILVIA:  Actually, one other potential juror whose name is Deruosi that I believe also falls into that category.
MR. RASMUSSEN:  Italian?
THE COURT:  I don't know that.
MR. SILVIA:  She – maybe that's a married name.  She appeared to be Asian.
THE COURT:  I don't know what her racial background is.  Do you recall that juror, Mr. Rasmussen?
MR. RASMUSSEN:  Yes, I do.  Anita Deruosi.  She was a housewife.  Her husband was into farming.  She – she answered questions.  She was not happy with racing and I thought that she may hold it against anyone that was involved with racing.  I thought she was a follower and I don't think she understood questions.  [¶]  In fact, when I asked her at one time, she said, "I don't understand the question."  When I asked her again, her response was, "I don't want to answer."
THE COURT:  Any response, Mr. Silvia?
MR. SILVIA:  None other than to say that I think that the reasons given are insufficient.
THE COURT:  Having heard the reasons by Mr. Rasmussen, I don't find that there was an exclusion because of race or national background.  I think that they were all legitimate challenges and – on each one of them, so I am going to deny the motion.

(Resp't's Lodged Doc. 10 at p. 194-97.)

"'[T]he Constitution forbids striking even a single prospective juror for a discriminatory purpose.'"  United States v. Collins, 551 F.3d 914, 919 (9th Cir. 2009) (quoting United States v. Vasquez-Lopez, 22 F.3d 900, 902 (9th Cir. 1994)).  Thus, each of the four potential jurors that Petitioner claims were impermissibly struck must be separately analyzed.

a.  Potential Juror Charlie Foo

Mr. Foo worked for Child Protective Services in the County of San Joaquin.  He was single with no children.  He stated that he had probably run into a few district attorneys.  He had not heard of the case, did not know any witnesses nor had he ever been a juror before.  (See Resp't's Lodged Doc. 10 at p. 46.)  The trial court determined that Petitioner had satisfied his

53

1  prima facie case with respect to Mr. Foo after Petitioner's trial counsel said Mr. Foo was Asian.

2  Nothing in the record suggests that this finding was in error nor does Respondent argue that the

3  prima facie case was not satisfied with respect to Mr. Foo.  Petitioner satisfied his prima facie

4  case with respect to the strike against Mr. Foo.

5        Upon a finding of the prima facie case, it was then incumbent upon the prosecutor to

6  explain the reasons for using the peremptory strike.  The prosecutor gave two reasons for why he

7  struck Mr. Foo.  First, as detailed above, he stated that he struck Mr. Foo because he smiled at

8  the Petitioner during voir dire proceedings.  Second, the prosecutor also stated that he struck Mr.

9  Foo because he was young and lacked life experience.  These were race-neutral reasons for the

10  strike.  Thus, whether Petitioner's constitutional rights were violated by the prosecutor striking

11  Mr. Foo rests on analyzing the third claim of the Batson inquiry.

12        In this case, the record does not indicate the relative ages of each of the potential

13  members of the jury pool.  Petitioner has the burden to show purposeful racial discrimination at

14  the third step of the Batson inquiry.  Here, as the record is silent as to the relevant ages of the

15  prospective jury members, Petitioner fails to show that the prosecutor's statement regarding the

16  relative age and inexperience of Mr. Foo was pretextual.  Additionally, Petitioner fails to show

17  that the prosecutor's argument that he struck Mr. Foo because he smiled at the Petitioner was

18  pretext.  See Brown v. Terhune, 158 F. Supp. 2d 1050, 1083 (N.D. Cal. 2001) ("The fact that a

19  prosecutor's reasons may be founded on nothing more than a trial lawyer's instincts about a

20  prospective juror does not diminish the scope of acceptable invocation of peremptory challenges,

21  so long as they are the actual reasons for the prosecutor's actions.") (internal quotation marks and

22  citation omitted), aff'd by, 59 Fed. Appx. 190 (9th Cir. Feb. 10, 2003); see also J.E.B. v.

23  Alabama, 511 U.S. 127, 148 (O'Connor, J., concurring) (peremptory challenges are often based

24  on "experienced hunches and educated guesses, derived from a juror's response at voir dire or a

25  juror's 'bare looks and gestures.'").  The record does not indicate that any jurors smiled at the

26  Petitioner during voir dire proceedings.  Thus, comparative juror analysis also does not support a

1   finding of pretext in this matter.  The prosecutor's stated reasons for striking Mr. Foo were not

2   implausible, inaccurate nor were they contradicted by this record.  Compare Lewis, 321 F.3d at

3   830 ("[I]f review of the record undermines the prosecutor's statement reasons, or many of the

4   proferred reasons, the reasons may be deemed pretext for racial discrimination."); Johnson v.

5   Vasquez, 3 F.3d 1327, 1330-31 (9th Cir. 1993) (rejecting prosecutor's proferred rationales when

6   they are erroneous or unsupported by the record).  Thus, Petitioner's Batson claim with respect to

7   Mr. Foo does not warrant granting federal habeas relief.

8                               b.  Potential Juror Patricia Lee

9          During the voir dire proceedings, Ms. Lee stated that she was self-employed as the owner

10  of a retail store.  She had not heard about the case, did not know any of the witnesses nor had she

11  ever served on a jury before.  (See Resp't's Lodged Doc. 10 at p. 151.)  The answers to these

12  introductory questions were the only questions that Ms. Lee answered during the voir dire

13  proceedings.  No party asked Ms. Lee any questions specifically and individually.  Petitioner's

14  trial counsel told the trial court that Ms. Lee was Asian.  As with Mr. Foo, the trial court found

15  that Petitioner had satisfied the prima facie case with respect to Ms. Lee.  Nothing in the record

16  suggests that this finding was in error nor does Respondent argue that the prima facie case was

17  not satisfied with respect to Ms. Lee.  It is determined that Petitioner has satisfied his prima facie

18  case with respect to the strike against Ms. Lee.

19         As stated above, the prosecutor's stated rationale for striking Ms. Lee was that she had a

20  strong personality.  This constituted a race-neutral reason for the strike, thus as with Mr. Foo, the

21  inquiry will center around the third step of the Batson analysis.

22         As the United States Supreme Court has explained, "[t]he trial court has a pivotal role in

23  evaluating Batson claims.  Step three of the Batson inquiry involves an evaluation of the

24  prosecutor's credibility, and the best evidence [of discriminatory intent] often will be the

25  demeanor of the attorney who exercises the challenge."  Snyder v. Louisiana, 552 U.S. 472, 477

26  (2008) (internal quotation marks and citation omitted).

1
2
3
4
5
6

> [R]ace-neutral reasons for peremptory challenges often invoke a juror's demeanor (*e.g.* nervousness, inattention), making the trial court's first-hand observations of even greater importance.  In this situation, the trial court must evaluate not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor.  We have recognized that these determinations of credibility and demeanor lie peculiarly within a trial judge's province, and we have stated that in the absence of exceptional circumstances, we would defer to [the trial court].

7   Id.  Thus, "deference is especially appropriate where a trial judge has made a finding that an

8   attorney credibly relied on demeanor in exercising a strike."  Id. at 479.

9          In Snyder, the prosecutor gave two rationales for why he had struck a potential black

10  juror.  The Supreme Court explained that the trial judge "simply allowed the challenge without

11  explanation."  Id. at 478.  Thus, the Supreme Court determined that it could not presume that the

12  trial judge credited the prosecutor's assertion that the potential black juror was nervous.  See id.

13         In this case, while the trial judge did not make a specific finding with respect to Ms. Lee's

14  demeanor (i.e., strong personality), it was the only rationale given by the prosecutor for striking

15  Ms. Lee.  Thus, unlike the situation in Synder, one can presume that the trial judge credited the

16  prosecutor's assertion that Ms. Lee had a strong personality as it was the only rationale he gave

17  for striking her.  The fact that the trial judge did not specifically state that he observed or recalled

18  the juror's demeanor in upholding the strike on Ms. Lee does not necessarily warrant federal

19  habeas relief.  See Thaler v. Haynes, 130 S.Ct. 1171, 1174 (2010) (per curiam).  Here, in light of

20  the deference that is owed to the trial judge for the prosecutor's demeanor-related strike,

21  Petitioner fails to meet his necessary burden to warrant the grant of federal habeas relief for the

22  prosecutor's use of a peremptory challenge against Ms. Lee.

23                          c.  Prospective Juror Anita Deruosi

24         Next, Petitioner argues that the prosecutor improperly struck Mrs. Deruosi on the basis of

25  her race.  In this case, Petitioner failed to establish a prima facie case with respect to Mrs.

26  Deruosi.  Unlike Mr. Foo and Ms. Lee, there was no specific finding by the trial court that

Petitioner satisfied his prima facie case with respect to Mrs. Deruosi.  Instead, Petitioner's trial

counsel mentioned Mrs. Deruosi as being improperly struck after the trial court had found that

Petitioner had met his prima facie case with respect to other potential jurors.  The trial court then

asked the prosecutor for his reasons for striking Mrs. Deruosi without stating on the record

whether the prima facie case had been met with respect to her.

At the evidentiary hearing, Petitioner stipulated that Mrs. Derousi is not Asian.  (Hr'g Tr.

Mar. 16, 2011 at p. 3.)  As previously noted, one required element to establishing the prima facie

case is that the potential juror is a member of a cognizable racial group.  See Boyd, 467 F.3d at

1143.  That requirement was not satisfied in this case.

Even if the prima facie case was met, Petitioner failed to show that the prosecutor's

reasons for striking Mrs. Deruosi were pretexual.  Mrs. Deruosi stated that she is a housewife and

that her husband is involved in farming.  She did not know any of the attorneys, parties or

witnesses in this case nor had she ever served on a jury before.  (See Resp't's Lodged Doc. 10 at

p. 120.)  The prosecutor gave two reasons for why he struck Mrs. Deruosi.  The prosecutor's

reasons were the following:  "[s]he was not happy with [street] racing and I thought that she may

hold it against anyone that was involved with racing.  I thought she was a follower and I don't

think she understood questions.  In fact, when I asked her one time, she said, 'I don't understand

the question.'  When I asked her again her response was, "I don't want to answer."  (Id. at p.

196.)

Both of the prosecutor's stated reasons for striking Mrs. Deruosi were race-neutral.  The

prosecutor's reason for the strike regarding Mrs. Deruosi's hatred of street racing is not

contradicted by the record.  The following colloquy took place between defense counsel and Ms.

Deruosi during the voir dire proceedings:

> MR. SILVIA:  Mrs. Derousi, how do you feel about some of these
> issues that we have been discussing, for instance the burden of
> proof?  Do you think it's a good concept, something you are
> willing to follow?
> PROSPECTIVE JUROR DEUOSI:  I would hope I could, but I

have feelings, too, about racing.  I'm not happy with it.  Kids
racing on the road.  And where I live – we live in a rule area and I
saw a child killed because the kids would race down the raod and
they still haven't been able to stop it.  And –
MR. SILVIA:  Have you –
PROSPECTIVE JUROR DEROUSI:  – it bothers me.
MR. SILVIA:  Have you contacted law enforcement?
PROSPECTIVE JUROR DERUOSI:  Yeah.  We had the sheriff
department put one of those cords over the road, but that hasn't
stopped it.
MR. SILVIA:  Do you think that your feelings about that are going
to interfere in any way with your ability to be a fair juror in this
trial?
PROSPECTIVE JUROR DERUOSI:  I hope not.

(Resp't's Lodged Doc. 10 at p. 135.)  The following colloquy does not contradict the

prosecutor's statement regarding Mrs. Deruosi's feelings regarding street racing.  Furthermore,

comparative juror analysis does not support a finding of pretext in this case.  No juror who was

empaneled had similar negative thoughts and feelings about street racing as did Mrs. Deruosi.

The prosecutor's second reason for striking Mrs. Deruosi was that he felt she was a

follower who did not understand his questions.  Similar to the analysis of Ms. Lee, this reason

goes to the prosecutor's thinking regarding Mrs. Deruosi's demeanor.  The trial court was in the

best situation to judge the prosecutor's credibility regarding this reasoning.[6]  Petitioner failed to

show that the non-racial reasons given by the prosecutor supporting his peremptory strike against

Mrs. Derousi were pretext for discrimination.  Petitioner is not entitled to federal habeas relief on

his Batson claim for the peremptory strike against Mrs. Deruosi.

d.  Potential Juror Violeta Egholm

Next, Petitioner argues that the prosecutor's strike of Ms. Egholm violated Batson.  In

response to the preliminary seven questions, Ms. Egholm stated that she lived in Manteca and

was an assistant manager.  Her husband worked at the Defense Tracy Depot.  She did not know

---

[6] It is worth noting that the prosecutor in supporting his second rationale for striking Mrs.
Derousi stated that at one point Ms. Derousi stated she did not want to answer the prosecutor's
question.  However, Mrs. Derousi did not say this, instead, she stated to the prosecutor that she
did not know how to answer one of the prosecutor's questions.

1    any of the attorneys, parties or witnesses in the case nor had she ever served on a jury before.

2    (See Resp't's Lodged Doc. 10 at p. 48.)  In objecting to the prosecutor's strike against Ms.

3    Egholm, Petitioner's trial counsel stated that she was Asian.  As with Mr. Foo and Ms. Lee, the

4    trial court found that Petitioner had satisfied the prima face case with respect to Ms. Egholm.

5    Nothing in the record suggests that this finding was in error nor does Respondent argue that the

6    prima facie case was not satisfied with respect to Ms. Egholm.  It is determined that Petitioner

7    satisfied his prima facie case with respect to the strike against Ms. Egholm.

8         The prosecutor gave three reasons for striking Ms. Egholm. First, he stated he, "could not

9    get her to respond to any of the questions."  (Resp't's Lodged Doc. 10 at p. 195.)  Second, he

10   indicated that he "never got her to respond to another question [besides the preliminary questions

11   that all of the potential jurors had to answer]."  (Id.)  Third, he stated that "I did not feel that I

12   knew her enough."  (Id.)  These are race-neutral reasons for the prosecutor's use of a peremptory

13   strike.  Thus, as with the analysis of Mr. Foo and Ms. Lee, whether Petitioner is entitled to

14   habeas relief for the strike against Ms. Egholm centers around the third step of the Batson

15   inquiry.

16        The following colloquy took place during voir dire between the prosecutor and Ms.

17   Egholm:

18            MR. RASMUSSEN:  Does anybody feel that there is reasonable
             doubt if you heard two people describe the same event and they
19            were different in how they described it?  Miss Turner –
             THE COURT:  I think before you get into that, I think it would be
20            two people describing an event differently could be reasonable
             doubt, but it doesn't necessarily automatically mean it's reasonable
21            doubt.  You might want to rephrase that.
             MR. RASMUSSEN:  Okay.  As the judge phrased it, two different
22            people describing the same event, could be reasonable doubt.
             Now, would you look at other things on why they described it
23            differently?  Miss Eghom.
             PROSPECTIVE JUROR EGHOLM:  I think it depends on how
24            they describe it.
             MR. RASMUSSEN:  Okay.
25            PROSPECTIVE JUROR EGHOLM:  Sometimes – depends on the
             body movement, you can see if they are telling the truth or not.
26            MR. RASMUSSEN:  Okay.

1   PROSPECTIVE JUROR EGHOLM:  So sometimes it depends on
    how the evidence was presented.
2   MR. RASMUSSEN:  Okay.  Would you look at other things, like
    the person's age?
3   PROSPECTIVE JUROR EGHOLM:  No.
    MR. RASMUSSEN:  You wouldn't – you don't think that's a
4   factor?
    PROSPECTIVE JUROR EGHOLM:  Not really.
5   MR. RASMUSSEN:  Okay.  How about where they were to see
    this event that they are describing, what angle they were, or how
6   close they were to it, would you look at those things?
    PROSPECTIVE JUROR EGHOLM:  Oh, yeah, of course.
7   MR. RASMUSSEN:  Okay.  So if someone, madam clerk, if she
    was describing something and someone in the very back part of the
8   room was describing what I'm doing, would you take into
    consideration where they were?
9   PROSPECTIVE JUROR EGHOLM:  Yeah.
    MR. RASMUSSEN:  What they described to you?
10  PROSPECTIVE JUROR EGHOLM:  Of course.

11  (Resp't's Answer Lodged Doc. 10 at p. 89-90.)  As the above colloquy between the prosecutor

12  and Ms. Egholm indicates, the first and second reasons given by the prosecutor are plainly

13  contradicted by the record.  The prosecutor did in fact get Ms. Egholm to respond to some of his

14  questions.   Explanations which are objectively and demonstrably false may help prove

15  discrimination on the basis of race.  See Chinchilla, 874 F.2d at 699; see also Burks, 27 F.3d at

16  1429 ("Chinchilla was thus a case where two of the three explanations offered by the prosecutor

17  were objectively demonstrably false.  Where, in such a case, defendant shows the remaining race-

18  neutral reason is not sufficiently 'clear and reasonably specific,' he may be deemed to have

19  carried his burden of proving intentional discrimination on the basis of race.").

20       In his Batson supplemental brief, Respondent states that Petitioner is not entitled to

21  federal habeas relief with respect to the peremptory strike against Ms. Egholm because:

22       A review of the record of voir dire shows the only time Ms.
         Egholm answered any questions, other than the general questions,
23       was when the prosecutor directly asked her about her thoughts on
         conflicting testimony.  Respondent recognizes the prosecutor's
24       stated reason is susceptible to two interpretations, (1) that Ms.
         Egholm did not answer any questions in addition to the general
25       questions and (2) that Ms. Egholm did not answer any questions in
         addition to the question the prosecutor directly asked her.  The
26       record clearly contradicts the first interpretation, so it is not

60

1  reasonable to think that is what the prosecutor meant or that the
   trial judge interpreted the prosecutor's proffered reason in this
2  manner.  In fact, if the trial judge had interpreted the prosecutor's
   statement to mean Ms. Egholm did not answer any additional
3  questions at all, the trial judge would have been compelled to find
   the prosecutor's reason was pretextual because it was contradicted
4  by the record.  However, the trial court could have reasonably
   interpreted the prosecutor's statement to mean Ms. Egholm did not
5  answer any questions in addition to the one the prosecutor directly
   asked her.  In fact, this is the only conclusion the trial judge could
6  have come to in order to find, as he did, that the stated reason was
   a valid justification for excusing Ms. Egholm.

7

8  (Resp't's Batson Br. at p. 13.)

9       This argument is without merit.  As previously stated, "'[i]f a prosecutor's proffered

10 reason for striking a [minority] panelist applies just as well to an otherwise - similar

11 [nonminority] who is permitted to serve, that is evidence tending to prove purposeful

12 discrimination to be considered at Batson's third step.'"  Kesser, 465 F.3d at 360 (quoting Miller-

13 El, 125 S.Ct. at 2325).  Comparative juror analysis reveals that there was at least one other juror

14 who only answered specific questions from the prosecutor as opposed more general questions

15 posed to all of the potential jurors by the prosecutor.  The only questions that juror number 11

16 answered during jury voir dire were those that were specifically asked of him by the prosecutor.

17 The following colloquy took place between the prosecutor and juror number 11 during voir dire:

18       MR. RASMUSSEN:  Anybody have any problem listening to
         someone testify that may use drugs recreationally?  Mr. Guerrero?
19       PROSPECTIVE JUROR GUERREO:  No.  I'm fine.
         MR. RASMUSSEN:  Okay. [JN11], is your first initial J?
20       JUROR NUMBER ELEVEN:  J for John.
         MR. RASMUSSEN:  Because we have – I think we excused this
21       morning a ___ and I was just wondering if it was ____.
         JUROR NUMBER ELEVEN:  No.
22       MR. RASMUSSEN:  Would you have a problem listening to
         someone that has – uses drugs recreationally?
23       JUROR NUMBER ELEVEN:  No, I don't think so.
         MR. RASMUSSEN:  Just hold them in the same standard as
24       everyone else?
         JUROR NUMBER ELEVEN:  If they were under the influence at
25       the time, it might be a something to weigh their testimony on, but –
         MR. RASMUSSEN:  Okay.  That's fair.
26       JUROR NUMBER ELEVEN:  – I wouldn't hold it against them.

1          MR. RASMUSSEN:  Okay.

2  (Resp't's Lodged Doc. 10 at p. 188-89.)  Besides the preliminary seven questions posed to each

3  potential juror by the court on the board, the above quoted colloquy shows the only questions

4  answered by juror number 11.  Respondent argues in his supplemental <u>Batson</u> brief that:

5                  Juror No. 11 was also not similarly situated to Ms. Egholm even
                though he only answered one question asked by the prosecutor.
6                  Juror No 11's response indicated he would be a favorable juror for
                the prosecution because some prosecution witnesses were alleged
7                  drug users and Juror No. 11 said he would not have a problem
                listening to the testimony of a person who had taken drugs in the
8                  past.  Compared to Ms. Egholm's rather rigid statement that she
                would not consider age in evaluating a witness' testimony, it is not
9                  difficult to distinguish the two jurors or to understand why the
                prosecutor would have preferred Juror No. 11 over Ms. Egholm.
10                 Moreover, there could have been additional demeanor-based
                reasons, not apparent from the face of the record, why the
11                 prosecutor chose to retain Juror No. 11 that may have distinguished
                Juror No. 11 from Ms. Egholm.

12

13  (Resp't's <u>Batson</u> Br. at p. 20.)

14          This argument by Respondent misapplies the third step of the <u>Batson</u> inquiry.  During

15  step three, courts may only consider the stated reason for the strike given by the prosecution.  <u>See</u>

16  <u>Miller-El</u>, 545 U.S. at 252 ("[W]hen illegitimate grounds like race are in issue, a prosecutor

17  simply has got to state his reasons as best he can and stand or fall on the plausibility of the

18  reasons he gives.  A <u>Batson</u> challenge does not call for a mere exercise in thinking up any

19  rational basis.  If the stated reason does not hold up, its pretextual significance does not fade

20  because a trial judge, or an appeals court, can imagine a reason that might not have been shown

21  up as false.").  As outlined above, two of the three proffered reasons for striking Ms. Egholm

22  were plainly contradicted by the record.  Additionally, even liberally construing the prosecutor's

23  proffered reason as Respondent requests, comparative juror analysis contradicts Respondent's

24  liberal interpretation of the prosecution's reasoning.  Both Ms. Egholm and juror number 11

25  never answered general questions posed by the prosecutor and each only answered one set of

26  specific questions posed by the prosecutor to them individually.

1   The only rationale given by the prosecutor with respect to the strike against Ms. Egholm

2   that is not necessarily contradicted by the record is his statement that he "did not feel that [he]

3   knew her enough." (Resp't's Lodged Doc. No. 10 at p. 195.) However, it is worth noting that

4   the prosecutor struck Ms. Egholm at the very beginning of the proceedings in one of his first set

5   of three peremptory strikes (Ms. Egholm was the third juror the prosecutor struck). Cf. Miller-

6   El, 545 U.S. at 244 ("[W]e expect the prosecutor would have cleared up any misunderstanding by

7   asking further questions before getting to the point of exercising a strike."); Kesser, 465 F.3d at

8   364 (stating that even where prosecutor could establish that prospective juror was pretentious

9   about her work, "he offered no explanation about how this would render her unsuitable for the

10  jury. He did not show how the finding was 'related to the particular case to be tried. Although

11  he claimed to be concerned about [the prospective juror's] attitude, he did not ask her further

12  questions about her work or her interpersonal experiences. For a Batson inquiry, we require

13  more than this.") (quoting Batson, 476 U.S. at 98). As the Ninth Circuit, quoting the Supreme

14  Court, noted in Green, "'[t]he State's failure to engage in any meaningful voir dire is evidence

15  suggesting that the explanation is a sham and a pretext for discrimination.'" 532 F.3d at 1033

16  (quoting Miller-El, 545 U.S. at 246). Here, the prosecutor's only reason not contradicted by the

17  record was that he did not know enough about Ms. Egholm. Rather than ask her further

18  questions to possibly gain more knowledge about this potential juror, the prosecutor struck Ms.

19  Egholm without engaging in any meaningful voir dire, and then based his strike on his failure to

20  know anything about her. Green and Miller-El lead to a finding of pretext with respect to the

21  prosecutor's use of a peremptory strike against Ms. Egholm.

22      Furthermore, even if the prosecutor's stated reason that he did not know enough about

23  Ms. Egholm is not necessarily pretextual, Petitioner has still shown that the prosecutor's strike

24  against her was pretextual under these particular circumstances. It is worth noting that at the

25  outset that at the evidentiary hearing, a declaration from the prosecutor was admitted into

26  evidence which stated that there was a man on the jury who was Asian and "appeared to be

1   Filipino." (Hr'g Tr. Mar. 16, 2011 Resp't's Ex. A.)  In <u>Turner v. Marshall</u>, 121 F.3d 1248, 1254

2   (9th Cir. 1997), the Ninth Circuit noted that while the fact that a prosecutor accepted the relevant

3   minority group on the jury may be considered indicative of a nondiscriminatory motive, "it is not

4   dispositive."  Thus, the fact that there was another Asian on the jury in Petitioner's case is not

5   dispositive.

6          Petitioner's case is similar to <u>Lewis</u>, 321 F.3d 824.  In <u>Lewis</u>, the court noted that there

7   was an African-American empaneled on the jury.  <u>See id.</u> at 827.  The purported peremptory

8   strike at issue was against another African-American juror (D.F.).  The Ninth Circuit stated the

9   following:

10              [T]he trial court's rejection of at least two or three of the
               prosecutor's proffered reasons militated against concluding that
11             D.F.'s potential connection to jail defeated the defendant's motion.
               In <u>United States v. Chinchilla</u>, [874 F.2d 695 (9th Cir. 1989)] we
12             reversed a trial court's finding that two prosecutorial strikes were
               not discriminatory.  Although the prosecutor had offered valid
13             reasons for both strikes, we concluded that the fact that he had also
               offered reasons that did "not hold up under judicial scrutiny"
14             undermined his credibility such that the trial court's finding was
               unwarranted.  In this case, the trial court determined that the
15             prosecutor offered several reasons that did not hold up under
               scrutiny, and cited only one that was "probably" reasonable.  Thus,
16             the argument for pretext int his case is stronger than the argument
               in <u>Chinchilla</u>.

17

18  <u>Lewis</u>, 321 F.3d at 833.  Ultimately, the Ninth Circuit determined that the state "court rejected

19  some of the prosecutor's reasons, offered a conflicting analysis of the record support for the

20  prosecutor's third reason, and found only that the reason was 'probably . . . reasonable.'  The

21  record warranted a finding of pretext."  <u>Id.</u> at 834-35.

22          Two of the three reasons given by the prosecutor are plainly contradicted by the record.

23  Furthermore, Respondent's argument in his brief with respect to an alternative possible meaning

24  for the prosecutor's use of a strike against Ms. Egholm further illustrates pretext in this case

25  using comparative juror analysis.  The fact that the other Asian juror peremptory strikes were

26  proper does not mitigate against a finding that the prosecutor's reason for striking Ms. Egholm

64

1   was pretextual.  See Turner, 121 F.3d at 1255 n. 4 ("[T]he striking of a single black juror for

2   racial reasons violates the equal protection clause, even though other black jurors are seated, and

3   even when there are valid reasons for the striking of some black jurors.") (internal quotation

4   marks and citations omitted).  In fact, in Lewis the Ninth Circuit found that habeas relief was

5   proper where two of the three reasons given by the prosecutor were rejected and there was one

6   member of the jury who was African-American, circumstances very similar to this case.

7        Conducting de novo review of Petitioner's claim that appellate counsel was ineffective

8   for failing to raise the Batson issue on appeal, and relying on cases which raised Batson issues

9   such as Miller-El, Green, Lewis and Turner, Petitioner satisfied to a reasonable probability that

10  the outcome would have been different had appellate counsel raised the Batson claim on appeal

11  in light of the strike used against Ms. Egholm.  While unnecessary to reach the issue due to

12  Petitioner's separate stand alone claim in Claim VIII, in light of the fact that Petitioner has

13  established that appellate counsel was ineffective for failing to raise the Batson issue on appeal,

14  he has satisfied the requisite cause and prejudice to overcome any possible procedural default to

15  be entitled to habeas relief on Claim VII as well even if Respondent had not waived the

16  procedural default issue.  Petitioner's request for habeas relief on Claims VII and VIII should be

17  granted.

18                              VI.  CONCLUSION

19       For all of the foregoing reasons, IT IS RECOMMENDED that the petition for writ of

20  habeas corpus be GRANTED.  Should the District Judge assigned to this matter agree with this

21  findings and recommendations, then it is recommended that Petitioner be released from custody

22  unless the State of California grants Petitioner a new trial within sixty (60) days.

23       This findings and recommendations is submitted to the United States District Judge

24  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days

25  after being served with these findings and recommendations, any party may file written

26  objections with the court and serve a copy on all parties.  Such a document should be captioned

1  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

2  shall be served and filed within seven days after service of the objections.  The parties are

3  advised that failure to file objections within the specified time may waive the right to appeal the

4  District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

5  DATED:  June 16, 2011

_____

TIMOTHY J BOMMER
UNITED STATES MAGISTRATE JUDGE